# CASES

## ARGUED AND DETERMINED

### IN THE

## UNITED STATES CIRCUIT COURTS OF APPEALS AND THE CIRCUIT AND DISTRICT COURTS

NATIONAL BANK OF COMMERCE OF TACOMA, WASH., v. TACOMA MILL CO.

(Circuit Court of Appeals, Ninth Circuit. October 3, 1910.)

No. 1,796.

1. BANKS AND BANKING (§§ 138, 151*) — RELATION BETWEEN BANK AND DEPOSITOR—UNAUTHORIZED PAYMENTS BY BANK—ESTOPPEL OF CUSTOMER.

A depositor sustains such relation to his bank that he is bound to give heed to the periodical statements coming from the bank in connection with the return of his passbook showing the balancing of his account. If he interposes no objection to such statements, the presumption naturally follows that he deems them correct, and the bank has the right to rely on such presumption and act upon it in the future. If transactions of an irregular character have been noted therein, such as the inadvertent payment by the bank of checks and drafts beyond the scope of express authority, it may be, depending upon the peculiar facts and circumstances attending the transactions themselves, that the depositor will be subsequently estopped to deny the authority of the bank to make such payments; but, if he has exercised proper and reasonable care to make the examination or in the selection of an agent to do so, he cannot be held responsible for the dishonest acts of an agent or employé.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 398–405, 300; Dec. Dig. §§ 138, 151.*]

2. BANKS AND BANKING (§ 138*)—RELATION BETWEEN BANK AND DEPOSITOR—LIABILITY OF BANK FOR UNAUTHORIZED PAYMENTS.

Plaintiff, a milling company, in the course of its business received from customers a large number of checks and drafts which it was its custom to deposit with defendant bank for credit to its account after their indorsement by an employé in a form agreed upon. Instead of depositing certain of such checks and drafts, the employé obtained cash for them from defendant, a portion of which he embezzled. Such checks and drafts were not entered upon plaintiff's books when received, that matter being in charge of the same employé; but in some cases he afterward entered the credit to the customer, using a part of the proceeds of a larger check or draft to cover the previous embezzlement. These checks and drafts were necessarily not shown on the bank passbooks nor in the bank's statements, nor did they appear on plaintiff's books, and the fact of their receipt was only ascertained by plaintiff by writing to its customers. The first of them were so cashed by the employé, some two years before the last. *Held,* that under the circumstances plaintiff was not negligent in failing to sooner discover and notify defendant of the transactions and was not estopped to recover from defendant the amount of its loss; it being

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

182 F.—1

found by the jury that defendant was not authorized to make the payments to the employé.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 398–405; Dec. Dig. § 138.*]

In Error to the Circuit Court of the United States for the Western Division of the Western District of Washington.

Action by the Tacoma Mill Company against the National Bank of Commerce of Tacoma, Washington. Judgment for plaintiff, and defendant brings error. Affirmed.

The plaintiff in error was the defendant below, and the Tacoma Mill Company the plaintiff. The action was instituted to recover moneys alleged to have been wrongfully paid to one F. Pinkham upon certain checks and drafts of which the mill company was the owner. The mill company had for a long time deposited its moneys, checks, and drafts with the bank, and had kept a deposit account with it. The complaint, among other things, sets out: That, for the purpose of authorizing the payment of money to plaintiff, the bank required plaintiff to file and deposit with it plaintiff's authorized signature, which was, when filed, in form as follows: "Tacoma Mill Company. By Chas. E. Hill, Resident Manager, F. Pinkham, Accountant." That said signature was at all times on file with the bank, but that, upon each occasion of the temporary absence from the city of Tacoma of either the said Charles E. Hill or F. Pinkham, a letter was written by plaintiff to the defendant bank notifying the bank of such contemplated absence, and giving the name and signature of the person who would be substituted for such absentee. That plaintiff's customers in different states and countries were accustomed to send their checks drawn upon the banks with which they did business, payable to the order of plaintiff, which checks plaintiff deposited with the bank. That, for the purpose of indorsing such checks for deposit, plaintiff and the bank adopted a stamp bearing the legend, "Pay to the order of Nat'l Bank of Commerce, Tacoma Mill Company, By ———, Cashier," and this legend was stamped upon the back of said checks and signed in the blank space provided therefor "F. Pinkham." That thereupon the checks would be delivered to the bank, and the bank would credit deposit account of plaintiff and proceed to collect the checks; but if any of them were not honored the amount thereof would be charged back to such account. That plaintiff, in the course of its business, received a large number of checks, among others certain checks which are particularly specified. That said checks, on or about the date of their receipt by plaintiff, were duly indorsed for the purpose of deposit, in the customary manner, by said F. Pinkham, and were presented to the bank, but that the bank, instead of placing the amount of such checks to the credit of plaintiff in its deposit account, did, without the authority of plaintiff, deliver and turn over to Pinkham the amount thereof in coin or currency. That thereafter, to wit, about September 1, 1908, Pinkham absconded without having paid to plaintiff the moneys thus received from the bank. And that the defendant bank has collected the amount of such checks, and has failed to account to plaintiff therefor.

The answer sets up that those certain checks described in the complaint were presented by Pinkham to the bank, in the usual course of business, stamped with the specified legend and signed by the said F. Pinkham, that the defendant did pay the amounts of said checks in cash to Pinkham, and that said Pinkham was fully authorized, and held out by plaintiff as authorized, to cash said checks and receive the money therefor, and defendant denies that such checks were duly indorsed for the purpose of deposit, or that they were paid without authority of plaintiff. For a further defense, it is alleged, in effect, that all deposits made by Pinkham as cashier of plaintiff were entered in a passbook furnished by defendant to plaintiff; that said passbook was balanced monthly, and settlements of said account were made during the time that said checks were cashed; that, had Pinkham dealt with said funds or checks in an unauthorized manner, plaintiff, by the exercise of ordinary care in its business and in the examination of said monthly settlements, could and would

have discovered the same; that had plaintiff exercised ordinary care in keeping its accounts with its customers, in the monthly settlements with defendant, or in the examination of said passbook, it would have discovered any and all alleged unauthorized acts of Pinkham; and that it was grossly negligent in omitting and failing to notify the defendant bank of Pinkham's peculations, and defendant was wholly without fault or negligence in paying such checks and drafts.

These checks forming the basis of the action are 14 in number. Two of them bear date March 6 and March 26, 1907, respectively. The remaining 12 bear date running from March 4, 1908, to August 12th of the same year. The first 2 checks were eventually withdrawn from the consideration of the jury, and verdict and judgment rendered for the amount of the 12 remaining.

There is little, if any, controversy as to the manner in which these checks were received by Pinkham, and by him presented to the bank, and by the bank paid to him. They were all indorsed in the usual and customary way; the indorsements bearing the signature "Tacoma Mill Company, by F. Pinkham, Cashier." Pinkham became cashier in 1899, and had so continued up to the time of his defalcation. As cashier he had charge of the cash drawer, and as head of the office kept the time book, and had general direction of the office. It was his duty to make up the bank statements for deposit, and this he generally did. The statements were made up daily, as a rule, in the afternoon about 2 o'clock, and Pinkham would either take them to the bank with the passbook in person, or send them by the assistant cashier. All the checks on hand each day were tabulated in this statement, and were taken to the bank and deposited. The bank rendered monthly statements of account to the mill company, and returned all checks drawn on the bank during the time covered by the statements. When these statements were rendered, the mill company, through Mr. Phillips, the bookkeeper, would check them over with its books to verify their accuracy. In this relation Mr. Phillips says: "When the bank's statement corresponded with the cashbook and checkbook, and no irregularities occurred in the bank's statement, it is not customary for business houses to go to the ledger account and check back for the purposes of verification."

As it respects the mill company's business, daily balance sheets were made up. Pinkham kept the cashbook, and once a month Hill, the manager, or Phillips, the bookkeeper, would check up the cashbook with the cash in the drawer; that is, they would count the money and check up the amount on deposit in the bank, and see that it balanced with the cashbook. The ledger appeared to be always in balance. When the shortage occurred, it was only ascertained by sending out statements to customers, who sent back canceled checks, and it was then ascertained that many of such customers had not received proper credit upon the mill company's books. An experting of the books disclosed the method of Pinkham in his peculations to have been that he would use remittances without then giving the customers proper credit upon the mill company's books. Later he would use other remittances, without then giving credit to the customers from whom they were received. With the latter he would give credit on the books for former remittances used, and would appropriate the surplus, and thus he would "wash back," to employ the expression of one of the witnesses, using the money from later remittances to pay those he had formerly abstracted, and so on from time to time, using more money all the while than he replaced. Thus he was brought to a point where it was necessary to obtain money upon the checks from the bank, to replace that which he had appropriated from remittances, which money was apparently used in that way. As to the checks, Mr. Hill describes what happened as follows:

"The checks were not placed to the credit of the account, and he would not enter them. We would not know whether they would come in or not. * * * We sent out statements on the first of every month, but apparently these never reached the customers * * * that had previously remitted. The statements would be passed on to Pinkham to be signed up. They would be made out by the bookkeeper and looked over by me and passed on to Mr. Pinkham. * * * The books of account do not show any credits in respect to the several accounts covered by the checks in evidence, except in respect to the

Mandan Mercantile Company account. That account shows it was credited and closed. That check came in probably the 9th or 10th of March, but the money was not credited to the account until some time in April. If the check had been deposited, the credit should have been given the day of the deposit or probably a day or two preceding. That was made up presumably from (the proceeds of) some other checks."

It was shown that the largest part of this defalcation occurred in 1908. On August 22d Pinkham absconded, and later committed suicide without making reparation for his defalcations. For further elucidation, reference may be made to the testimony of Dan Phillips, one of the accountant experts called by plaintiff. After referring to the Mandan Mercantile Company check, dated March 26, 1907, which was evidently paid by the bank in March, but was not credited to the customer sending it until April 5th following, the witness testified as follows:

"Q. Now, as an expert, when you reached that item in the cashbook, what conclusion did you reach as to the status of the account of the Mandan Mercantile Company? A. I tried to locate when this money had been deposited from the slips the bank furnished us. Q. But you could not? A. No. Q. Never was deposited, was it? A. No. Q. Now, if you had taken the cashbook for the months of March and April and had taken the bank statements returned, showing the deposits made in the bank, and checked them, you could have ascertained the deposit account was shy just $310.22? A. We did discover it; yes, sir. Q. That was a simple matter? A. Since we could not locate it in the deposits, of course it was a simple matter. Q. That is, any ordinary bookkeeper, by checking the cash account for March and April with the deposit account as returned by the bank for those months, would have discovered the discrepancy for that amount? A. You have got to include your cash on hand to make a balance of it. Q. But it would have been discovered that check had not been deposited, wouldn't it? A. Certainly would. * * * An examination of the bank statement at the end of March would show nothing. There is no entry on the books there that the amount had been paid at that time. At the end of April and first of May the bank statements show that this particular item had not been deposited, but it had been entered on the cashbook and credit given to the customer. Q. Suppose you had occasion to run over the statement and there was no discrepancy in your cashbook, would your attention be likely to be attracted to the fact that a particular check had not been deposited? A. It would—certainly would. You might not in every individual item there, but you can pick out any large item and see if that corresponds with the deposit as shown in your bank statement. Q. If you were to pick out a particular item—be suspicious and go through the bank statement to see if that particular item had been deposited—you would discover it? A. Yes, sir; I certainly would. Q. But what I am asking you is whether, on receiving the bank statement of this kind in the month of April—your books balanced regularly—there would be nothing to excite your suspicions and cause you to make a comparison of your cash items and of your items of account with these items? A. Yes, there would. I would run across the item, for instance, of $310.22. I would look to see where it had been deposited, and cannot find a deposit for it. Q. I understand. But suppose this comes back to you at the end of the month and your cashbook is balanced, is there anything that excites your suspicion by that fact which would prompt you to go through your books and compare every item to see if there is a discrepancy? A. There might be. Q. But, I say, is there? A. No, not on the face of these bank statements. Q. And if your books balanced, on receiving this, as a bookkeeper, would there be anything to prompt you to go back and make a suspicion against a man you trusted and check over every item of his account and see whether every credit he had given on his account was identical with this statement? A. There would not. Q. Would there be anything suspicious to prompt you to investigate? A. There would not as long as we had all in balance. Q. In the ordinary course of bookkeeping, if, when you received your cash balance and it corresponds with your stub book and your cash balances, would you go into details and examine each item to see if the balance and items were correct? A. It is customary to do so; yes, sir. Q. That is, to run over

every item? A. Go over an item and check it off.   Q. On the statement? A. On the statement; yes, sir."

F. S. Blattner, L. B. Da Ponte, and John E. Heasty, for plaintiff in error.

Hughes, McMicken, Dovell & Ramsey, for defendant in error.

Before GILBERT and ROSS, Circuit Judges, and WOLVERTON, District Judge.

WOLVERTON, District Judge (after stating the facts as above). While this is ostensibly an action to recover for cash items alleged to have been wrongfully paid by the bank to an agent of the plaintiff unauthorized to receive the same, yet it involves an account between the bank and the plaintiff, wherein, by the theory of plaintiff, the items should have been included by placing them to the credit of plaintiff instead of paying them out as was done. The defendant, after putting in issue the alleged want of authority of the agent to receive such cash payments, answers in effect that, by reason of the giving out of the passbook by defendant to plaintiff, and the monthly balancing thereof and settlements concerning the same, an account was stated from time to time between the parties, and that plaintiff is now estopped to question the verity of such account. This is in short what is left of the entire controversy between the parties. It all hinges about the effect of the use of the passbook, the monthly statements made by the bank concerning the transactions with the plaintiff, and the plaintiff's acts and conduct with respect to such statements of account. It is further asserted, in the same connection, however, that, if it be true that Pinkham dealt with the checks and funds of the plaintiff in an unauthorized manner, plaintiff, by the exercise of ordinary care in its business and in the examination of the passbook and the monthly statements made by the bank in connection therewith, could and would have discovered the same, and that it should therefore have notified the bank of the irregularity, and thus have protected it against further payments to Pinkham, and that, because of plaintiff's negligence in this particular, the bank should not be held liable upon such subsequent payments.

Two principal questions are presented upon the record:

First, it is urged that it is a depositor's duty to check and compare the statements furnished by the bank, purporting to show the state of his account, with his books of account, and to make such investigations as will enable him to verify such statements, and thereby to detect any inaccuracy concerning them. It is insisted that, had this rule been observed, Pinkham's misconduct would have been discovered in April or May, 1907, and further loss would have been prevented; hence that plaintiff is not entitled to recover for checks thereafter cashed by Pinkham.

Second, it is urged that it was incumbent upon the plaintiff to exercise reasonable care in supervising the acts of Pinkham, its agent, and especially that part of the duty assigned to him in checking up the bank statements, and that, had the plaintiff performed its duty in this regard, it would readily have discovered the peculations of Pinkham

in April, and, for this further reason, that recovery should not be had for checks cashed subsequent to that date.

Appropriate instructions to the jury were framed to cover these contentions, but the court refused to give them, and error is assigned.

The question as it respects Pinkham's authority to receive these cash payments as agent of plaintiff, whether real or apparent, was fully submitted to the jury by clear and pertinent instructions, and the jury found against the defendant on that issue; that is to say, they found that Pinkham possessed no such authority from plaintiff.

We have first to determine what was the plaintiff's duty toward the bank in the examination and verification of the bank statements, rendered monthly, in connection with the passbook, and whether what it did or omitted to do in that relation has estopped it from recovering any part of the moneys sued for.

Without discussing the doctrine of estoppel, and the principle upon which it is based, we may here assume that, if it was the duty of plaintiff to examine these bank statements as rendered, and if, by such examination as plaintiff was bound to give them, a disclosure of Pinkham's irregular actions in cashing these checks would have resulted, then plaintiff would be obliged to notify the bank thereof, and by neglect so to do would be estopped to recover for payments subsequently made. We say by such examination as the plaintiff was bound to give to the statements rendered by the bank in connection with the passbook, because the special inquiry is: What was the plaintiff's duty in that particular?

It has long been the usage of banks to give out passbooks to their customers, in which the latter are credited with their proper deposits. These passbooks are sent in as occasion may seem to demand, often periodically and by request of the bank, as well as upon the volition of the depositors, and are posted, or statements returned with them, along with the paid checks or vouchers, showing the condition of the depositor's account upon the books of the bank. It matters little whether the passbooks are sent in voluntarily or by request of the bank to be posted—the purpose and effect of the statements rendered by the bank in connection therewith are the same. They not only afford a means whereby the depositor may discover errors to his prejudice, but furnish evidence in his favor in the event of dispute or litigation with the bank. They serve to protect him against the carelessness and fraud of the bank. The right thus accorded by banks to frequent accountings in this manner, so that the depositor may keep informed as to the condition of his account as it appears upon the books of his depositary, is one of such manifest advantage that it entails a correlative duty upon the depositor. It requires of him an examination of the account rendered, and, if errors or omissions become apparent, it is then incumbent upon him to bring them to the attention of the bank, by returning his passbook for correction, or by other convenient method. Otherwise, his silence will be regarded as an admission that the entries as shown are correct. As is said in Leather Manufacturers' Bank v. Morgan, 117 U. S. 96, 107, 6 Sup. Ct. 657, 660 (29 L. Ed. 811):

"The depositor cannot, therefore, without injustice to the bank, omit all examination of his account, when thus rendered at his request. His failure to make it or to have it made, within a reasonable time after opportunity given for that purpose, is inconsistent with the object for which he obtains and uses a passbook."

So it was held in that case that the question of whether the depositor exercised the proper degree of care required of him in the examination of statements rendered him by the bank in writing up his passbook, under the circumstances disclosed by the evidence, including the relations of the parties and the established usages of business, was one for the jury, and the cause was accordingly reversed and remanded. The case was one where a confidential clerk, a youth of about 17 years of age, having the entire management of his employer's office, forged, by raising them, certain checks which his employer, as agent of Ashburner & Co., had drawn upon their account with the defendant bank. Pursuant to his employer's instructions, the clerk filled up certain checks, between the dates of September 11, 1880, and February 13, 1881, which, being signed by his employer, were altered by the clerk before they were taken from the office, and then by him presented to the bank for payment. The bank paid them, and the clerk accounted for the amount of the checks as originally drawn, and appropriated the amount measured by the raise. When the checks were drawn, their true amounts were entered regularly upon the stubs of the checkbook, but the clerk forced the footings of the stubs by making the false additions equal to the increase of the altered checks. The employer's passbook was written up at the bank October 7 and November 19, 1880, and January 18, 1881, and balances struck showing the amount of credit upon each of the dates. Upon each date the book was returned with all checks that had been paid subsequent to the previous balancing, including the altered checks. Across the face of the passbook was written at the date of balancing the number of checks returned. At each time as the book was returned, the clerk destroyed such of the checks as he had altered. The clerk was intrusted, the employer having implicit confidence in him, with the balancing of the checkbook when the passbook was returned; the employer's attention at times being attracted to the statements made by the bank. He usually kept track of the balance as shown by the checkbook.

The employer discovered the forgeries, which were so cleverly made that they were difficult of detection, about the 1st or 2d of March, 1881. The clerk had remained away from the office for a day, and the employer made comparison of the passbook with the stubs of the checkbook. Finding that a certain number of checks appearing on the stubs were not charged against him on the passbook, he returned the passbook to the bank to be again balanced. This being done, two vouchers were returned which were found to be altered, and this led to the discovery of all the altered checks. The bank having charged such overpayments to the account of the depositor, suit was instituted to recover them as for a balance upon account. It appeared by the employer's testimony that, had he made such examination as was made by him in March at either of the previous balancings of the passbook, he would have detected the forgeries, and thus would have been en-

abled to protect the bank against further payment of the altered checks by giving it timely notice. It goes without saying that, if the forgeries had been discovered, a duty would at once have devolved upon the depositor to notify the bank, so that it would not pay other like forged checks; but the inquiry relates to the character of diligence required on the part of the depositor that he may test the correctness of the accounts rendered and balanced in connection with the passbook. If he has omitted the proper care and diligence in the examination of such balanced accounts, the duty to notify his depositary of errors and irregularities in the account rests upon him with the same weight as if the irregularities were actually known to him. Otherwise, the depositary would suffer through the negligence of the depositor. It was held in this case that the depositor owes the further duty to the bank of properly supervising the conduct of his agent in the examination of the bank statements, where it appears that the agent was the person who committed the frauds and had an interest in concealing them. The duty of making proper examination of the balanced passbook when returned to the depositor is said to be a primary one which is devolved upon the principal, and he must either attend to it himself or see to it that some competent person discharges it for him. But where that duty is intrusted to the same person who has charge of the transactions which go to make up the account, then it is incumbent upon the principal to show due and proper care in supervising the conduct of that agent while acting in the discharge of that (the principal's) duty. What that duty is depends upon the peculiar facts and circumstances of each particular case. The court, speaking to that subject in the case under review, says:

"It is sufficient to say that the latter's duty (the depositor's) is discharged when he exercises such diligence as is required by the circumstances of the particular case, including the relations of the parties, and the established or known usages of banking business."

Myers v. Southwestern National Bank, 193 Pa. 1, 44 Atl. 280, 74 Am. St. Rep. 672, was a similar case to that of Bank v. Morgan. Here a confidential clerk forged numerous checks, which were paid by the bank and charged to his employer's account. The duty of the clerk included the making of deposits, occasionally handing in the bank book to be written up and balanced, and, when that was done, then to receive the canceled checks, with the payment of which the bank had credited itself, and to deliver the same to his employer for examination and approval. Further than this, he was charged with the duty of verifying the bank book as the same was written up and balanced from time to time, and reporting the result to his employer. This the clerk professed to do, but in fact falsified his employer's books, and falsely reported that the balances were correct. During the period involved the bank book was balanced 12 times.

"If, at the time of each settlement," says the court, "the forged checks had been examined by the plaintiff, or if the number and the aggregate amount of the checks had been compared with the number and amounts of the checks separately entered in the bank book, or if the checks had been compared with the stubs of the checkbook, or if the additions of the deposits and checks on the checkbook had been examined, the forgery would have been discovered."

Based upon these premises, it was held as matter of law that the plaintiff was not entitled to recover; the court further saying:

"In contemplation of law, the delivery of the checks to plaintiff's clerk was a delivery by the bank to the plaintiff himself, as the basis on which its credits were claimed. The bank was therefore entitled to have them examined, and, if rejected, returned within a reasonable time. That was not done, and, because of plaintiff's failure to perform his duty in that regard, he should not be permitted to recover. Any other rule would be inconsistent not only with general and long-established custom, but also with well-settled principles of law on the subject."

In another case (Morgan et al. v. United States Mortgage & Trust Co., 125 App. Div. 22, 109 N. Y. Supp. 274), under very similar circumstances, the question whether the depositor was guilty of negligence such as would relieve the depositary from liability upon forged checks, paid subsequent to a time when the forgeries should have been discovered, was submitted to the jury.

In Critten v. Chemical Nat. Bank, 171 N. Y. 219, 63 N. E. 969, 57 L. R. A. 529, the plaintiffs had in their employ a clerk whose duty it was to fill up checks to be drawn in the course of the business, to make corresponding entries in the stubs of the checkbook, and to present the checks so prepared, together with the bills in payment of which they were drawn, to one of the plaintiffs for signature. The party signing would place the check, together with the bill, in a sealed envelope properly addressed, and put it in the mailing drawer. During the period of time from September, 1897, to October, 1899, the clerk in 24 separate instances abstracted one of these envelopes from the mailing drawer, opened it, and with acids obliterated the name of the payee and the amount specified in the check, then made the check payable to cash, raised the amount, and drew the money on it from the defendant bank. From the money drawn he paid the bill, and appropriated the excess. The checks so altered were charged to the account of plaintiffs, which was balanced every two months, and the vouchers returned to them. To the clerk was intrusted the duty of verifying the bank balance. At a time when the clerk was away, this duty was assigned to another, and he discovered the irregularity, and with it the forgeries. Under these facts, the court held that it was not too much, in justice and fairness to the bank, to require of the depositors, where they had such a record as they possessed, to exercise reasonable care to verify the vouchers by that record. It is said, in effect, that the knowledge of the forgeries that the clerk had was in no respect to be attributed to the plaintiffs, but that plaintiffs were chargeable with such information as a comparison of the checkbook would have imparted to an innocent party previously unaware of the forgeries.

So in Hardy & Bros. v. Chesapeake Bank, 51 Md. 562, 34 Am. Rep. 325, which is analogous on the facts to the preceding cases, the court says:

"It must be borne in mind that the appellants were not bound at their peril and under all circumstances to detect the forgery. They were simply bound to refrain from doing any act that would reasonably have the effect of misleading the appellee to its hurt or injury, and not fail to do any act that positive duty required them to do for the protection of the appellee.   *   *   * We therefore think that the jury should have been required to find either that

the appellants had knowledge in fact that the forgeries had been committed, or that, from carelessness and indifference to the rights of others, they failed to inform themselves from sources of information readily accessible to them, and which, by the exercise of ordinary diligence as business men, would have disclosed to them the fact that the forgeries had been committed. If such facts be found to exist, then it must be also found, in order to work an estoppel, that the appellee acted, in honoring and paying the nine checks in question, in reference to the conduct of the appellants in failing to make known an objection to the account as stated and balanced in the bankbook on the 13th of July, 1873, and that such omission and neglect of the appellants did in fact mislead the appellee into the error of paying the nine forged checks now in dispute."

Again, in speaking of the duty of a depositor in relation to the examination of his passbook when written up by the bank, the court continues:

"What is such duty may not in all cases be easy to determine; but we think it not too much to say that, in a case like the present, there is a duty owing from the customer to the bank to act with that ordinary diligence and care that prudent business men generally bestow in such cases, in the examination and comparison of the debits and credits contained in his bank or passbook, in order to detect any errors or mistakes therein. More than this, under ordinary circumstances, could not be required."

Another case of interest to note is Dana v. National Bank of the Republic, 132 Mass. 156. That case turned specifically on the question of ratification, because there was but one check that was forged and paid and that entered into the bank's statement of account. The following observations are found in the opinion of the court:

"The plaintiffs owed to the defendant the duty of exercising due diligence to give it information that the payment was unauthorized; and this included not only due diligence in giving notice after knowledge of the forgery, but also due diligence in discovering it. If the plaintiffs knew of the mistake, or if they had that notice of it which consists in the knowledge of facts which, by the exercise of due care and diligence, will disclose it, they failed in their duty; and adoption of the check and ratification of the payment will be implied. They cannot now require the defendant to correct a mistake to its injury, from which it might have protected itself but for the negligence of the plaintiffs. Whether the plaintiffs were required, in the exercise of due diligence, to read the monthly statements or to examine the checks, and how careful an examination they were bound to make, and what inferences are to be drawn, depend upon the nature and course of dealing between the parties, and the particular circumstances under which the statements and checks were delivered to them."

In the light of these authorities, it is manifest that the depositor sustains such a relation to his banker as that he is bound to give heed to the periodical statements coming from the bank in connection with the return of his passbook showing the balancing of his account with the bank. If he interposes no objection to such statements, the presumption naturally follows that he deems them correct. The bank has a right to rely upon such presumption, and to act upon it in the future. If, furthermore, transactions of an irregular character have been noted therein, such as the inadvertent payment of checks and drafts by the bank beyond the scope of express authority, it may be, depending upon the peculiar facts and circumstances attending the transactions themselves, that the depositor will be subsequently estopped to deny the authority of the bank to make such payments. The duty

thus devolving upon the depositor is one that he is entitled to perform by himself or through another. If he designates another for the purpose, he must exercise proper care and circumspection in selecting a person in whom confidence and trust may be reposed, for, unless he does, he may make himself responsible for the fraudulent acts of his agent. But, having used such reasonable and proper precautions, he cannot be held liable for the deceitful and dishonest acts of his agent, for the simple and very potent reason that the agent is not his agent for such purposes. As to them, the agent is acting wholly without the scope of his authority. To many details of an extensive business, it is impossible for the owner or manager to give personal attention. Nor is it expected that he will set a watch over the particular conduct of all his agents so that he will be personally advised of all they may do. If he exercises the ordinary care and diligence that business men are wont to exercise in the selection of capable and honest agents, and is then ordinarily watchful in the general conduct of his business to detect dishonesty and fraud by those acting for him, that is all that those dealing with him can expect or demand. What an agent does for the principal, however, acting within the scope of his authority, becomes the act of the principal, and so it is that the knowledge of the agent, acquired in the legitimate discharge of the duty assigned him, must be deemed to be the knowledge of the principal. But it is neither reasonable nor just to impute to the principal knowledge coming to the agent acting in disregard of his instructions or in fraud of his principal's interests. It being the duty of the depositor to examine the statements of his bank when periodically balancing his passbook, it must follow that he is charged with knowledge of what those statements contain, whether he makes the examination in person or through an agent designated for the purpose. Logically, also, he must know the state of his own accounts, if regularly and honestly kept. He is not bound to know what a dishonest clerk may have inserted therein contrary to the fact, and with a purpose of deceiving and defrauding him; but he would be bound to know what the legitimate facts or entries would disclose if followed to their natural sequence in the exercise of ordinary business care and alertness. That is to say, if legitimate entries and the manner of their entry in books of account or books of business memoranda would be suggestive of other facts, or would lead to further inquiry before an ordinarily prudent man, acting in business concerns, would be satisfied, then the principal must know what the inquiry would result in if the information at hand were followed to its natural tendency.

Now, to apply these principles to the case in hand. We find that, when the passbook was written up and returned by the bank, Phillips, another clerk of the mill company, would check the statements over with the company's books to verify their accuracy, and when the bank's statements corresponded with the cashbook and the checkbook, and no irregularities appeared, he did not pursue the inquiry further. Nor was there any occasion to, the fact being all the time that the entries in the checkbook, and the items returned as deposited in the bank, stated the facts truly. The items appropriated by Pinkham, while they should have been placed to the mill company's credit at the bank,

and therefore should have appeared upon the company's deposit account, being withdrawn from the bank in cash, were not proper for entry in the bank account, either upon the debit or credit side thereof. Hence an examination of the bank's written up passbook, with a return of the checks or a list of the items deposited, would not reveal in any way the fact of the wrongful negotiation of the checks and drafts remitted to the mill company from its customers. There could be no suggestion whatever, from anything that appeared from these statements of account, or the lists made up by Pinkham for deposit, or the lists of deposit rendered by the bank, of any further transactions between the bank and the mill company. Unlike some of the cases of which note is taken here, where the balances on the stubs of the checks issued were forced and an inspection would have disclosed the irregularity, the bank statements, in comparison with the checkbook and cashbook, exhibit a businesslike and satisfactory record, from which no suspicion of irregularity could arise.

But it is strenuously urged that, as the Mandan Mercantile Company received a credit on the 5th of April, 1907, and the item went into the cash account of the mill company, it being an item of payment which in the usual course of business should have passed to the credit of the mill company in the bank, the mill company should have taken note of the fact, and that, by pursuing the further inquiry which was subsequently pursued, and sending out to customers for their statements of account, the peculations of Pinkham would have been disclosed, and thus the mill company would have been enabled to protect the bank from further cash payments, and ought to have done so. We think, however, the duty of a depositor towards his bank in relation to the examination of the bank statements, made in connection with its writing up and balancing the depositor's passbook, does not reach to that extremity. The statements, as we have shown, are rendered for the purpose of advising the depositor of the state of his account. If those statements tally with the deposit slips made up by the depositor and the checks drawn against the bank, and if the balances agree one with the other, the depositor is not obliged to look further, nor to bear in mind some irregularity that may appear elsewhere in his general books, although a searching inquiry might lead to a discovery of the fraud. The present case is illustrative of the principle. The mill company was unable to ascertain what had happened, until it sent out to its customers for statements of their accounts and called in experts to determine the condition of its books. It was then discovered that the Mandan Mercantile Company credit was given on April 5th, which gave a clue to the line of inquiry, and led to a discovery of the fact that that item did not appear in the bank deposit, as it should have done; and it was found that, if the items in the mill company's cash account had been checked with the deposit account, it would have shown that this item had not been deposited, although it is probable the cash had been drawn from the bank, in this particular instance, and put in the cash drawer of the mill company. The inquiry which the defendant would have had the plaintiff pursue to discover the fraud is collateral to an examination of the passbook and the record of checks drawn against the bank account, and it does not seem to us that the

plaintiff was guilty of such negligence in relation thereto as that the question should have been submitted to the jury. We find no error, therefore, in the court's refusal to give the instructions requested by plaintiff.

This disposes of the first and second points of plaintiff in error.

The third point made is that the bank, under the circumstances shown by the evidence, cannot be charged with negligence for having paid the customers' drafts to Pinkham. The jury found that these drafts were paid by the bank without authority. That covers the issue, and disposes of it effectively.

The fourth point is that the evidence shows a case of apparent or ostensible authority in Pinkham to cash customers' drafts. This is also one of the very questions presented to the jury, and the defendant is concluded by its verdict. The question was certainly not, under the evidence, one of law for the court.

The next and last point made is that:

"The proof shows that in many instances Pinkham accounted for the proceeds of the customers' checks cashed by depositing the same in the cash drawer. In no instance of this kind can the bank be held liable, even though the proceeds of said checks were so used for the purpose of making good sums previously abstracted from the cash drawer."

Touching this question, the court instructed the jury as follows:

"It is not incumbent upon the mill company in order to make out its case to prove that Pinkham did not bring this money down to the office of the mill company or to prove that he did not use the money for the purposes of the mill company. If the mill company has established, in addition to the admitted facts, that Pinkham cashed—if the mill company has established, as it has by the admitted facts, that Pinkham cashed—these checks and received the money, then, unless a preponderance of the evidence shows that Pinkham was authorized to receive it, the plaintiff is entitled to recover, because, under the circumstances, the bank has paid the money to a person who had no authority to receive it; and in this state of affairs the mill company was not bound to trace the money after it reached the hands of an unauthorized person, if, in fact, that money was paid to an unauthorized person. If Pinkham was unauthorized, and if in fact that money did reach the office of the company, that would be a matter for the bank to prove, because if it once paid money to an unauthorized person it could only justify itself by proving that this money did reach this mill company or was otherwise used for the benefit of the mill company."

To this instruction there is no exception, and by it also the plaintiff in error is precluded.

Finding no error in the record, the judgment below is affirmed.