(August 31, 1912.)

## HENRY CRAB, Appellant, v. CITIZENS' STATE BANK, Respondent.

[126 Pac. 520.]

BANK DEPOSIT—PAYMENT OF UNAUTHORIZED CHECK—NOTICE TO BANK— LACHES OF DEPOSITOR—INSTRUCTIONS.

(Syllabus by the court.)

1. Evidence examined and considered, and *held* that it clearly establishes the fact that the bank had notice that the checks cashed by it were not to be paid out of the private account of appellant, and that the drawer of such checks had no authority to check on appellant's account.

2. The principle of law established by the authorities that a depositor will be estopped by his laches in failing to promptly notify the bank of the forgery of a check which it has paid out of his account, or that such check was unauthorized, is not applicable to the facts of this case, for the reason that the bank had notice at the time it paid the checks that such checks were drawn without authority and were not to be paid out of the private account of the appellant Crab, but were to be paid out of the account of the Atlanta Mercantile Co., a corporation.

3.   The relation existing between a bank and its depositor is that of debtor and creditor, and before the bank can charge the account of its depositor with a check drawn by someone else, it must show authority or ratification by the depositor.

4.   Certain instructions given in this case examined, and *held* erroneous, and not applicable to the facts of the case.

SULLIVAN, J., dissenting.

APPEAL from the District Court of the Fourth Judicial District for Elmore County. Hon. Edward A. Walters, Judge.

. Action for debt.   Judgment for defendant; plaintiff appealed.   *Reversed.*

Daniel McLaughlin and Perky & Crow, for Appellant.

The relation between a bank and a depositor is purely one of debtor and creditor.   (*State v. Thum,* 6 Ida. 323, 55 Pac. 858.)

A bank is presumed to know the signature of its customers, and if it passes a forged check, it cannot, in the absence of negligence on the part of the depositor whose check it purports to be, charge the amount to his account.   (5 Cyc. 544.)

If the defendant's officers, who have been paying the altered checks, could by proper care and skill have detected the forgeries, then it could not receive the credit for the amount of those checks, even if the depositor omitted all examination of his account.   (2 Morse, sec. 472; *Yarborrah v. Bank Loan & Trust Co.,* 142 N. C. 377, 55 S. E. 296.)

.W. C. Howie and E. M. Wolfe, for Respondent.

If the bank acts honestly in the payment of checks, the depositor must do all that he can reasonably to avoid loss or injury from the payment of unauthorized checks.   (*Leather Mfrs. Nat. Bank v. Morgan,* 117 U. S. 96, 6 Sup. Ct. 657, 29 L. ed. 811; *First Nat. Bank v. Allan,* 100 Ala. 476, 46 Am. St. 80, 14 So. 335, 27 L. R. A. 426; *Nat. Bank of Commerce v. Tacoma Mill Co.,* 182 Fed. 1, 104 C. C. A. 441;

*Whitsett v. People's Nat. Bank,* 133 Mo. App. 81, 119 S. W. 999; *Myers v. Southwestern Nat. Bank,* 193 Pa. 1, 74 Am. St. 672, 44 Atl. 280; *Cunningham v. First Nat. Bank,* 219 Pa. 310, 123 Am. St. 657, 68 Atl. 731; *Brown v. Lynchburg Nat. Bank,* 109 Va. 530, 17 Ann. Cas. 119, 64 S. E. 950; *Israel v. State Nat. Bank,* 124 La. 885, 50 So. 783; 5 Am. & Eng. Ency. of Law, 1068.)

## STATEMENT OF FACTS.

This action was brought by the plaintiff in the court below to recover $561.06, as a balance due on the deposit that the plaintiff had with the defendant bank. Plaintiff was the president and general manager of the Atlanta Mercantile Co., a corporation, and had been such officer since the organization of the corporation. This corporation was engaged in the mercantile business at Atlanta in Elmore county. The appellant owned the controlling interest in the corporation. The company had been doing its banking business with the defendant bank, and appellant had also been doing an individual banking business with the same institution. He was carrying the two accounts in the bank. About the 1st of January, 1908, the appellant, as president and general manager of the Atlanta Mercantile Co., and acting for such company, entered into a written contract with one William Brothers, whereby it was agreed that Brothers should take the management and control of the corporation and conduct its business and devote his sole time and attention to the business and affairs of the corporation, and maintain its assets at the value then invoiced at $13,738, and that for his services he should have one-half the net profits of the corporation. Appellant thereupon left for California and did not return until sometime in the following April. When appellant left he had a personal and individual account with the respondent bank, and the corporation also had an account at the same bank. Brothers issued checks from time to time in the course of his business, which were paid by the bank. The first checks issued seem to have been on the printed form made specifically for the Atlanta Mercantile Co., with the company's name already printed on the checks ready

for the signature of the president or manager. In issuing these checks Brothers signed appellant's name, but made no attempt to imitate the signature of appellant, and the bank all the time knew that the signature was not made by appellant Crabb, but was written by Brothers. After this form of check was exhausted, Brothers began using the ordinary check, to which he did not sign the Atlanta Mercantile Co.'s name, but simply signed the name of Henry Crabb. These checks were still paid and charged to the Atlanta Mercantile Co. account. Later on, that account apparently ran low, and the bank paid some $600 worth of these checks and charged them to the individual account of Crab. In the meanwhile, Crab was in California and was checking against his personal account until he had reduced it to the sum of $561.06. Brothers testifies that he was at the bank at one time and told the cashier that he must not pay any of the checks which he (Brothers) issued out of Crab's individual account, for the reason that he had no authority to check against that account. The written contract between the parties gave Brothers no authority to check on Crab's account and was not an agreement or contract between Crab and Brothers, but rather between the corporation and Brothers. This agreement, however, says nothing about the signing of names or issuing of checks for any purpose or on any account. Brothers says he understood that he had full authority to do any business in Crab's name, although he told the bank that he had no authority to check on Crab's personal account. Brothers testifies that immediately after Crab returned from California he told him that some checks had been issued against his individual account. It is quite clear, however, from the record that Crab did not discover that his individual account was over-checked until after he came to Boise and had issued a check and sent it to Mountainhome and the check had been presented and refused payment. He then returned to Mountainhome and Atlanta, and he and Brothers went over the account to discover what had become of his individual deposit.

--- -- --- ----

The court gave the following instructions, to which appellant objected and excepted:

"6. If you find from the evidence that the plaintiff in this case deposited with the defendant bank in the name of Henry Crab the sum of $2,828.25, and that $561.06 of that account was paid out upon checks issued in the name of Henry Crab but in fact signed by William Brothers, and that the proceeds of said checks paid claims against the Atlanta Mercantile Co., of which Henry Crab was president and general manager and had the power to check against this account, and you further find that the said Henry Crab discovered that the said checks had been charged up against his account which were in payment of the Atlanta Mercantile Company's claims and that after learning of it he had the power and ability to issue checks against the Atlanta Mercantile Co.'s account to replace this amount, but failed and neglected to do so, that such failure and neglect would release the defendant bank from any further obligation and he would be unable to recover in this action."

"7. If you find from the evidence that the $561.06 on which this suit is brought was in fact paid out of the Henry Crab account by the bank on checks signed in the name of Henry Crabb, but by his manager, and you further find that said manager was not authorized to sign the name of Henry Crab to checks on his individual account, but if you further find that the said Henry Crab discovered that these checks had been signed by Brothers and at the time he did so learn he had money in the Atlanta Mercantile Company account, it was his duty to check back from the company account to his own, instead of holding the bank in damages.

"It is a depositor's duty to do all in his power to save the bank harmless where money has been paid on unauthorized checks.

"8. In this case the bank admits that plaintiff deposited with it $2,828.25, and claims that it has paid the said sum and $63.36 more, back to Mr. Crab, either directly, on his own signed checks, or on checks signed in his name by his manager and for the use and benefit of Mr. Crab, and if

you find that it was so paid back, you should find for the defendant.''

AILSHIE, J.   (After stating the facts.)—It is clear that Brothers had no authority to check against appellant's private account, and it is equally clear that the bank knew appellant's name had been signed to the checks by Brothers, and that these checks were in fact intended to be drawn against the account of the Atlanta Mercantile Co.

The principle of law contended for by respondent and supported by *Leather Mfrs. Nat. Bank v. Morgan,* 117 U. S. 96, 6 Sup. Ct. 657, 29 L. ed. 811, *First National Bank of Birmingham v. Allen,* 100 Ala. 476, 46 Am. St. 80, 14 So. 335, 27 L. R. A. 426, *National Bank of Commerce v. Tacoma Mill Co.,* 182 Fed. 1, 104 C. C. A. 441, *Myers v. Southwestern National Bank,* 193 Pa, 1, 74 Am. St. 672, 44 Atl. 280, and 5 Am. & Eng. Ency. of Law, 1068, is not applicable to the facts of this case.   No element of laches is shown here, and no grounds appear for invoking the doctrine of estoppel against appellant.   (2 Morse on Banking, sec. 472.)   The bank already had notice that these checks should not be paid from Crab's account.   On the other hand, Crab appears to have notified the bank as soon as the bank declined to pay his personal checks and notified him that his private account was overdrawn.

The relation existing between a bank and its depositor is that of debtor and creditor (*State v. Thum,* 6 Ida. 323, 55 Pac. 858; Morse on Banking, sec. 289), and before a bank can charge the account of its depositor with a check drawn by someone else, it must show authority or ratification from the depositor.

Instructions 6, 7, and 8 were erroneous, and not applicable to the facts of this case.   They undoubtedly misled the jury to the prejudice of appellant.

The judgment is reversed and a new trial is granted.   Costs awarded in favor of appellant.

Stewart, C. J., concurs.

SULLIVAN, J., dissenting.—I dissent from the conclusion reached by the majority of the court. This case was tried by the court with a jury and upon all of the evidence and the instructions of the court, the jury found a verdict in favor of the defendant bank, which verdict and the judgment entered thereon was absolutely right, in my view of the matter. The general rule in regard to the relation existing between a bank and its depositors is correctly stated in the majority opinion, but the facts of this case bring it within a well recognized exception.

The capital stock of the Atlanta Mercantile Co. amounted to 25,000 shares. Henry Crab issued to himself 24,995 shares of that stock, and gave one share each to five persons, who were to serve as directors. It clearly appears that he was the whole corporation—general manager and treasurer—and had absolute control of all of its affairs. It appears that some time after the issuance of the 25,000 shares of stock, 3,000 shares of stock were issued, but it does not appear how many of the 3,000 shares were issued to Crab. Crab, without consulting the directors, leased said mercantile business and the property of said corporation to Brothers and went to California. Brothers had full charge of said business, and when he first began to conduct said business had a check-book on which was printed at the bottom of each check, "Atlanta Mercantile Co., by," and it was the custom in issuing such checks by said company, if Crab issued them, to sign his own name, and if Brothers issued them, to sign Crab's name also. It also appears that the Mercantile Company had a rubber stamp which was used in signing its name, and that after Brothers had used up the checks on which were printed "Atlanta Mercantile Co.," he used an ordinary check-book, and the evidence shows that he neglected to use the stamp of the Mercantile Company on said checks, but signed Henry Crab's name thereto, and the bank paid such checks out of Henry Crab's private account. Each and every one of such checks was applied in the payment of the Mercantile Company's debts.

Crab went to California in the fall of 1907 and returned to Atlanta in April, 1908. Brothers met him at Mountainhome and went on horseback with him from Mountainhome to Atlanta. Brothers testified that on said trip he informed Crab that he had paid some of the company's debts out of Crab's private account by drawing checks thereon, and also informed him that there was sufficient money in the company account in said bank at that time to repay him for all that had been taken out of his private account, which, he testified, seemed to be satisfactory to Crab at that time. But Crab thereafter, in his honesty of purpose, evidently concluded that as he had not authorized Brothers to draw checks on his (Crab's) private account, he would compel the bank to lose that amount, and he, Crab, being the Mercantile Company, would have the company's debts paid to the amount of the personal checks so drawn, without costing him one cent. He would thus be gainer by $561.06. In carrying out this pretended just and equitable conclusion, he proceeded at once to draw from said bank all of the funds belonging to the Mercantile Company to pay other debts of the company, and then brought this suit to recover from the bank the amount it had paid out on said personal checks, leaving the bank without any remedy whatever, unless it would be a remedy against Brothers, who, perhaps, was not able to respond and pay said amount. And it is clear from said transaction that Crab, with an assumed high sense of honor and justice, was ready and willing that the bank should either lose said $561.06 which had been paid on the company's debts, or recover it from said Brothers, and make Brothers pay that amount of the company's debts. Any way I can look at this matter, it is clear to my mind that Crab intended dishonestly to procure the payment by the bank of debts of the corporation, of which he owned almost the entire capital stock. As I view it, had Crab intended and desired to act honestly in this matter, when he ascertained that a part of his corporation's debts had been paid from his private account and that there were ample funds in said company's account with said bank to repay said amount to him,

in good faith and honesty he should have adjusted the matter and not attempted to compel the bank to pay a part of the debts of said corporation.

The character of Crab is clearly revealed by the evidence in this case, to the effect that upon discovering that said checks had been paid out of his private account, he immediately proceeded to overdraw the company account, and then approached the bank with an offer that if they would replace the money in his private account, he would issue a check upon the company's account to cover that amount. He was there ready to issue a check upon an already overdrawn account, and absolutely refused to adjust said matter with the bank, after he was fully advised of the conditions, until he had overdrawn the Mercantile Company's account. Under the facts of this case, Crab owed some obligation to the bank, and upon his discovering that the company's debts had been paid out of his private account, he should have notified the bank of the exact condition of affairs. Had he done so, the bank at that time could have protected itself against the company account; but, instead of doing so, he intimates to Brothers that the matter is all right, and then proceeds to overdraw the company's account. While there is a direct conflict in the evidence as to Brothers' informing Crab on his return from California that he had made checks against Crab's private account, Brothers testifying that he did so inform him and Crab testifying that he did not, the jury evidently believed Brothers, and believed that Crab was given information sufficient at that time to have enabled him to adjust the matter between the bank and the corporation, of which he owned a large majority of the stock. But my associates seem inclined to believe Crab's evidence on that point instead of Brothers, and thus reverse the jury. Had Crab desired to act honestly and fairly in the matter, at the time he discovered that his private account had been drawn against in payment of his company's debts, instead of bringing suit against the bank, which bank in no way profited by said deal, he should have then and there drawn from the company's account a sufficient amount to replace what had

been drawn from his private account in payment of said company's debts. In that way the bank would have been safe, the company and Henry Crab (who was in fact the Mercantile Company) would have paid their bills, and Crab would have had his private account restored.

This case was tried upon equitable principles, such as are announced in many decisions, and especially in the case of the *Leather Mfrs. Nat. Bank v. Morgan*, 117 U. S. 96, 6 Sup. Ct. 657, 29 L. ed. 811, and the authorities there cited. In that case the supreme court of the United States uses the following language:

"These cases are referred to for the purpose of showing some of the circumstances under which the courts, to promote the ends of justice, have sustained the general principle that where a duty is cast upon a person, by the usages of business, to disclose the truth (which he has the means, by ordinary diligence, of ascertaining), and he neglects or omits to discharge that duty, whereby another is misled in the very transaction to which the duty relates, he will not be permitted, to the injury of the one misled, to question the construction rationally placed by the latter upon his conduct. This principle commends itself to our judgment as both just and beneficent; for, as observed by the supreme court of Ohio, in *Ellis v. Ohio Life Ins. & T. Co.*, 4 Ohio St. 628, 64 Am. Dec. 610, while in the forum of conscience there may be a wide difference between intentional injuries and those arising from negligence, yet no man conducts himself 'quite as absolutely in this world as though he was the only man in it; and the very existence of society depends upon compelling everyone to pay a proper regard for the rights and interests of others. The law, therefore, proceeding upon the soundest principles of morality and public policy, has adapted a large number of its rules and remedies to the enforcement of this duty. In almost every department of active life rights are in this manner daily lost and acquired; and we know of no reason for making the commercial classes an exception.' . . . .

"Still further, if the depositor was guilty of negligence in not discovering and giving notice of the fraud of his clerk,

then the bank was thereby prejudiced, because it was prevented from taking steps, by the arrest of the criminal, or by an attachment of his property, or other form of proceeding, to compel restitution.''

Along the same line are the following cases: *The First Nat. Bank of Birmingham v. Allan,* 100 Ala. 476, 46 Am. St. 80, 14 So. 335, 27 L. R. A. 426; *Nat. Bank of Commerce v. Tacoma Mill Co.,* 182 Fed. 1, 104 C. C. A. 441; *Myers v. So. Western Nat. Bank,* 193 Pa. 1, 74 Am. Dec. 672, 44 Atl. 280.

A depositor owes a duty to the bank to immediately report to it any payment of forged or otherwise illegally drawn checks, so that the bank may take such steps as are necessary to protect itself and recover the money, and a failure to do so is a waiver by the depositor of his claim against the bank. (*Cunningham v. First Nat. Bank,* 219 Pa. 310, 123 Am. St. 657, 68 Atl. 731; *Brown v. Lynchburg Nat. Bank,* 109 Va. 530, 17 Ann. Cas. 119, 64 S. E. 950; *Israel v. State Nat. Bank of New Orleans,* 124 La. 885, 50 So. 783.)

In 5 Am. & Eng. Ency. of Law, p. 1068, it is stated: ''Although free from blame in the first instance, the drawer may by his subsequent acts so ratify or acquiesce in the forgery, or so mislead the bank, as to relieve the bank of all liability.'' And at page 1069, it is stated: ''If the party fails to act promptly in giving notice of the forgery after the discovery of the same, to the injury of parties entitled to notice, he will be prevented from recovering the damage shown to have been actually incurred.''

These cases refer to forged checks, and it is contended that the checks in question were not forged, and for that reason said cases are not applicable. But I cannot understand why any different rule should apply to checks drawn as the checks in question were than to a forged check, as reasonable diligence is required as well in the one case as in the other. It is conceded that Brothers issued said checks without authority. Forged checks are always issued without authority. The principle suggested is based upon the general law governing all business, to the effect that where a mis-

take or error occurs in dealings between parties, it is the duty of any party injured by such mistake or even wrongdoing to do everything in his power to mitigate and prevent any and all damage which might result from it to others. So when Crab's attention was called to the fact by Brothers himself that Brothers had drawn certain checks against Crab's private account in payment of said corporation's debts that should have been charged against the company account, it was the duty of Crab to so conduct himself as to protect the bank and himself, if possible. The evidence clearly shows that he could have protected himself and the bank, too. There was plenty of money in the company account to have replaced the money drawn from Crab's private account. Crab had full control of the company account and had the right to check against it and repay his private account, thus preventing any damage to himself, and the law, equity and good conscience required him to do so. The record clearly shows that Crab is anxious, ready and willing to make the bank or Brothers pay the $561.06 of debts of a corporation practically owned by Crab, of which corporation he holds and owns at least 25/28 of the stock. He seeks to beat the bank upon the mere technicality that Brothers had, through mistake, or without authority, drawn checks upon the private account of Crab in payment of the company's debts. I fail to observe, under the facts of this case, where there is any equity or justice in permitting Crab to reap the benefit of a mistake, the complete remedy for which he had in his own hands, and had he pursued that remedy, the bank would have been saved harmless and Crab's private account restored to all the cash drawn out and applied in payment of his corporation's debts.

The jury arrived at a correct verdict, and the judgment ought to be sustained.