## FIRST NAT. BANK OF PHILADELPHIA v. FARRELL et al.

(Circuit Court of Appeals, Third Circuit. January 4, 1921. Rehearing Denied April 25, 1921.)

### No. 2562.

1. **Banks and banking ⬅148(3)—Depositor must report errors in statements without delay.**

A depositor must examine the bank's periodical statements, and report to the bank without unreasonable delay any errors he may discover, or the bank may regard his silence as an admission that the entries as shown are correct.

2. **Banks and banking ⬅148(3)—Depositor is charged with knowledge of agent's fraud, which statements examined by agent would have disclosed.**

A depositor, who intrusted the management of his bank account to an agent, who was authorized to draw checks thereon, and who permitted the agent to verify the bank's statements, is charged with notice of fraudulent checks drawn by the agent, which would be disclosed by an examination of the statement, though not with the agent's knowledge of the fraud otherwise acquired.

3. **Banks and banking ⬅148(3)—Depositor's failure to examine statements does not relieve bank from liability for own wrongs.**

The failure of a depositor to examine the statements of the bank, which would have disclosed that the depositor's agent was drawing checks in excess of his authority, does not relieve the bank's liability to the depositor for its wrong in paying checks drawn by the agent in excess of the power of attorney in the bank's possession.

4. **Payment ⬅47(1)—Money in agent's account delivered to principal cannot be credited against bank's liability for cashing unlawful checks by agent.**

In an action by a depositor against a bank for the amount paid on checks drawn by the depositor's agent in excess of his authority, of which the bank had knowledge, the bank is not entitled to credit for the amount drawn by the agent from his own account in the bank after the fraud was discovered, and delivered by him to the depositor.

---

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

5. **Banks and banking ⊗⇒119—Bank's relation to depositors is that of debtor and creditor.**

    The relation between a bank and its depositors is that of debtor and creditor.

6. **Banks and banking ⊗⇒142—Agent's money deposited in principal's account deducted, in determining liability to principal for honoring unlawful checks by agent.**

    In an action by a depositor against a bank for the amount of checks paid to the depositor's agent, exceeding the amounts he was authorized to draw, a deposit by the agent from his own funds to the principal's account to cover a previous unlawful withdrawal must be deducted from the gross deposits for the principal before the lawful checks drawn on the account were deducted, to ascertain the balance due on the unlawful checks.

7. **Payment ⊗⇒63(1)—Pleadings held to have limited depositor's recovery against a bank for amount secured by specified unlawful checks paid to agent.**

    In an action by a depositor against a bank to recover the amount of unlawful checks paid to the depositor's agent, where the plaintiffs in their pleadings eliminated from the transaction between them and the bank all checks within the agent's authority and all unlawful checks, the proceeds of which indirectly reached the depositor, leaving only an undisputed balance in the bank and the amount of 35 unlawful checks paid to the agent, the depositor cannot object to a deduction from the amount of those unlawful checks of a credit for the agent's own money deposited to the principal's account, on the ground that the suit was not on the 35 checks, but for the difference between the total deposits and the lawful withdrawals.

8. **Banks and banking ⊗⇒142—Bank held entitled to credit against unlawful checks paid by agent for agent's money deposited in principal's account.**

    In an action by a depositor against a bank for the amount paid by the bank to the depositor's agent on checks drawn in excess of his authority, plaintiff's statement, showing that the total amount deposited in the bank to plaintiff's credit included a deposit made by the agent of his own money to replace amounts which he had previously withdrawn on checks exceeding his authority, some of which were among those involved in the suit, shows that the gross deposits in plaintiff's account included the deposit of that money twice to his credit, so that it should be deducted from the gross deposits before the amount of the lawful withdrawals is deducted to ascertain the balance due to plaintiff.

In Error to the District Court of the United States for the Eastern District of Pennsylvania; J. Whitaker Thompson, Judge.

Action by M. Walter Farrell and others, trading as Weil, Farrell & Co., against the First National Bank of Philadelphia. Judgment for plaintiffs (263 Fed. 778), and defendant brings error. Judgment reduced, and affirmed, as modified.

Joseph S. Clark and Owen J. Roberts, both of Philadelphia, Pa., for plaintiff in error.

Henry A. Rubino, of New York City, and J. Howard Reber and Percival H. Granger, both of Philadelphia, Pa., for defendants in error.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

WOOLLEY, Circuit Judge. The judgment brought here by this writ of error was entered by the District Court for want of a sufficient

affidavit of defense upon pleadings drawn to state a case of undisputed facts and to present only issues of law. We shall speak of the parties as they stood in the court below, and shall give only the main facts of the case in an endeavor to avoid the confusion which has arisen from the number and complexity of their details.

The plaintiffs had for many years been engaged in the business of selling commercial paper. They operated from a main office in Boston through branch offices in other cities, one of which was in Philadelphia. The Philadelphia office was opened in March, 1910, with M. T. Snyder as their agent.

The course of business was briefly this: The plaintiffs sent Snyder commercial paper to sell to local banking institutions. When Snyder made a sale he was required immediately to report the same by telegraph or telephone to the plaintiffs at Boston and deposit the proceeds —invariably the purchaser's check or draft drawn to the plaintiffs' order—to the credit of their account with the Girard National Bank of Philadelphia. Such deposit was required to be made by two deposit slips, an original and duplicate; the original, giving the name of the maker of the check, the amount thereof, and the total, if the deposit included several checks, to be retained by the bank; the duplicate, showing the same entries, to be stamped by the receiving teller and returned to Snyder for transmission to the plaintiffs, thereby showing that the proceeds of the sale previously reported had been deposited. Snyder had no power to draw on this account.

Later in 1910, the plaintiffs opened an account with the Merchants' National Bank of Philadelphia. A short time afterward this bank merged with the First National Bank of Philadelphia, the defendant in this action, the latter bank at the same time taking over the account. This account, standing always in the name of Weil, Farrell & Co., was a petty cash account opened by the plaintiffs upon a deposit of $1,000 for the use of Snyder in meeting the expenses of the Philadelphia office. Against this account Snyder was authorized to draw checks for limited sums under a power of attorney made by the plaintiffs and lodged with and accepted by the defendant bank as the terms on which it carried the account. The power of attorney, so far as it is pertinent to this case, is as follows:

"Know All Men By These Presents, That we, Weil, Farrell & Co., do make, constitute and appoint M. T. Snyder our true and lawful attorney for us and in our name—

"(1) To draw checks against our account in the Merchants' National Bank of Philadelphia, Pa., in no event to draw in excess of $1000 at any one time * * * and to have full authority to manage and make settlement of said account."

"(2) To endorse notes, checks, drafts, or bills of exchange, or other instruments of writing for deposit as cash, or for collection, in the Merchants' National Bank of Philadelphia, Pa."

It thus appears that in the conduct of the plaintiffs' banking business, Snyder, their agent, had authority to deposit without limit to the credit of, but not to draw in any amount upon, their account with the Girard National Bank; and that he had authority to make deposits in any amount to the credit of their account with the First National Bank,

the defendant, and to draw against the same as often as he chose in an amount not in excess of $1,000 at any one time. Under this arrangement Snyder conducted in an orderly way the plaintiffs' business with the two banks until April, 1915, when, desiring to embark in speculation, he conceived a scheme whereby he could obtain the use of his principals' money for short periods as it flowed from purchasers of commercial paper through the banks to the plaintiffs in Boston.

Snyder's scheme was this:

When his principals sent him commercial paper, Snyder had to account for it either as unsold or sold. If sold, he was required to account for the proceeds by sending to the plaintiffs the stamped duplicate deposit slip of the Girard National Bank, evidencing deposit of such proceeds with that institution. Having no power to draw on this account, Snyder, in order to use the plaintiffs' money, had to get it before it reached this account. Therefore, instead of depositing the proceeds of sales of negotiable paper to the credit of the plaintiffs' main account with the Girard National Bank as he should have done, he deposited the same, or much of them, to the credit of the plaintiffs' petty cash account with the First National Bank, the defendant. Having authority under the power of attorney to draw against this account by as many checks as he chose, but never at any one time for a sum in excess of $1,000, he could have drawn from the defendant bank by checks within that limit all the money he there deposited to the credit of the plaintiffs. But, as his speculative transactions were large and as his deposits made to meet them were correspondingly large, drafts by a great number of checks for small amounts would inevitably have excited suspicion. He therefore drew against the plaintiffs' account with the defendant bank (thus augmented) by checks substantially larger in amount than those authorized by the power of attorney. These checks the bank honored.

By this means Snyder drew for his personal use large sums of money from the plaintiffs' account with the defendant bank. But money thus obtained had to be used quickly and had to be restored or replaced by other money, because in the plaintiffs' method of doing business the proceeds of negotiable paper which Snyder had reported as sold were required presently to appear by duplicate deposit slip to have been deposited in the Girard National Bank. Such deposit was imperative upon Snyder. To make it he had to have money. He found the money by appropriating the proceeds of later sales, and, depositing them with the Girard National Bank, he reported such deposits as the proceeds of earlier sales. He did this in one of two ways, and, when under the necessity of forcing figures, he did it in both ways. They were these: First, he deposited with the Girard National Bank the check of a purchaser in a later transaction, drawn as always to the order of the plaintiffs, properly noted as to name and amount on the original deposit slip, making the duplicate deposit slip show the same money entries as the original but leaving it blank as to the name of the maker of the check. Such duplicate, showing correctly the amount deposited but being mute as to the maker of the check deposited, the paying teller of the Girard National Bank stamped in evidence of the deposit

made, and on its return to Snyder he falsified it by filling in the blanks with the name of the purchaser of a previously reported sale. Or second, Snyder drew a check for an amount in excess of $1,000 on the plaintiffs' account with the defendant bank and deposited it to the credit of the plaintiffs' account with the Girard National Bank. By the latter move Snyder would, of course, get none of the plaintiffs' money, but he would thereby be able to make the necessary deposit to cover earlier sales, or to force the figures properly to correspond.

Transactions of this character carried Snyder over for only a few days at a time, but during such short periods he was able to use the plaintiffs' revolving funds in an amount which remained constant at between $90,000 and $100,000. Obviously he was required to repeat these transactions again and again in order to keep himself in speculative funds and to keep a few days ahead of exposure.

These transactions, running from July, 1915, to May, 1917, grew in bulk to 382 checks, each in excess of $1,000, honored by the defendant bank in violation of the plaintiffs' power of attorney, and aggregated the astonishing sum of $3,161,981.74.

After discovery the plaintiffs brought this action against the bank to recover a book balance of $751.96 admittedly due, and the sum of $92,750, the amount which they claimed should have remained to their credit had the defendant bank observed their power of attorney and had not honored checks in excess of the authority there conferred and limited; first, however, giving the defendant bank credit for all moneys paid on checks unlawfully honored in excess of $1,000 which had ultimately reached them through redeposit with the Girard National Bank. On these items with interest, less a small credit not in issue, the trial judge, sitting without a jury, entered judgment for $94,445.26. 263 Fed. 778. To this judgment the instant writ is directed.

Of the several questions involved the first arises out of a defense made to the whole action. By the power of attorney under which the plaintiff depositors opened and the defendant bank carried the account, Snyder, the plaintiffs' agent, in addition to the power to draw checks in limited amounts, was given "full authority to manage and make settlement of said account." Pursuant thereto the bank rendered monthly statements to Snyder, who, under the authority thus conferred, examined and approved the same without submitting them to the plaintiffs. Had they been received and examined by the plaintiffs they would have disclosed deposits grossly disproportionate to the purpose for which the account was kept, and also heavy withdrawals by checks drawn by Snyder and honored by the bank beyond the authority which the plaintiffs had conferred upon them.

As the plaintiffs had delegated to an agent the duty of examining the monthly statements, the defendant bank claimed at the trial that the plaintiff depositors were chargeable with knowledge of all that its agent knew and all that the statements and cancelled checks disclosed, and that, in consequence, the bank, on the plaintiffs' failure to inform it of Snyder's unlawful conduct, was not liable to the plaintiffs for unlawful withdrawals following the period when they should have found it out.

As we approve the decision of the learned trial judge against this contention on the authorities and for the reasons given, 263 Fed. 778, 783, 786, we shall very briefly state and distinguish the rules of law which we think control this question.

[1] A depositor sustains such relation to his bank that he is bound to give heed to its periodical statements showing the transactions of his account. Out of this relation there has grown a rule of law which requires a depositor in a bank to examine, personally or by an authorized agent, and with due diligence, his balanced pass-book, or the bank's periodical statements showing credits and debits, accompanied with paid checks as vouchers for the latter, and to report to the bank without unreasonable delay any errors he may discover. Otherwise the bank may regard his silence as an admission that the entries as shown are correct. Leather Manufacturers' Bank v. Morgan, 117 U. S. 96, 6 Sup. Ct. 657, 29 L. Ed. 811; National Bank of Commerce v. Tacoma Mills Co. (C. C. A. 9th) 182 Fed. 1, 104 C. C. A. 441.

[2] Without weakening this general rule, other principles come into operation according as circumstances vary its application and according also as it responds to the test whether the failure of the depositor promptly to examine the bank's statements and apprise it of discovered errors has misled the bank to its prejudice. These arise more frequently when an agent, whom the depositor has authorized, as in this case, to examine and settle the account, has himself depleted the account by forged checks, altered checks, or checks drawn beyond the scope of his authority, against which the bank has a right to be protected. Here the depositor owes the bank the further duty of properly supervising the conduct of his agent in the examination of the bank's statements especially where it appears that the agent committing the frauds had an interest in concealing them. National Bank of Commerce v. Tacoma Mills Co., 182 Fed. 1, 8, 104 C. C. A. 441. This obviously should be so, for, aside from its own diligence, a bank's only protection against forgeries by a confidential agent to whom settlement of the bank account has been delegated is verification of statements by the depositor himself, who in such case is clearly responsible for the acts and omissions of his agent in the course of duties with which he had entrusted him. Myers v. S. W. National Bank, 193 Pa. 1, 44 Atl. 280, 74 Am. St. Rep. 672. In such instances the cases hold that knowledge of a dishonest agent of fraudulent entries and incorrect balance is equally the knowledge of his principal, with the qualification, however, that the principal is chargeable, not with the knowledge of wrongdoing the agent possessed from the fact that he himself was dishonest, but with knowledge of such facts as an honest agent, unaware of the wrongdoing, would acquire when examining the statements within the scope of his employment. The dishonesty of the agent does not change his relationship to his principal, and accordingly does not change the rule charging his principal with knowledge of such facts. Dana v. National Bank of Republic, 132 Mass. 156; First National Bank v. Allen, 100 Ala. 476, 40 South. 335, 27 L. R. A. 426, 46 Am. St. Rep. 80; Critten v. Chemical National Bank, 171 N. Y. 219, 63 N. E. 973, 57 L. R. A. 529; Leather Manufacturers' Bank v. Morgan, 117 U. S. 96, 6 Sup. Ct. 657, 29 L. Ed. 811.

[3] But the general rule arising from the examination of pass-book or statements by the depositor himself, and the variation of the rule arising from the examination of them by his authorized agent, involve in practically every reported instance wrongdoing where the negligence of the bank was not involved and where the wrongful act was entirely that of a person other than the bank. Both the rule and its variations disappear altogether where the bank has been negligent in detecting the fraud; National Dredging Co. v. Farmers' Bank, 6 Pennewill (Del.) 580, 69 Atl. 607, 16 L. R. A. (N. S.) 593, 130 Am. St. Rep. 158; Manufacturers' National Bank v. Barnes, 65 Ill. 69, 72, 16 Am. Rep. 576; Myers v. Southwestern National Bank, 193 Pa. 1, 44 Atl. 280, 74 Am. St. Rep. 672; when the neglect of the bank to observe the limitation of a drawing power was, as here, the primary and proximate cause of the loss; and particularly where, as here, the wrongful act (in the sense of conduct beyond the scope of its authority) was the act of the bank itself, but for which the criminal act of the trusted agent could not have been carried into execution. In honoring checks beyond the authority granted it by the depositors' power of attorney,— a document in its possession,—the bank in this case knew, or was charged with knowledge of, its own unlawful conduct. Manufacturers' National Bank v. Barnes, supra; Leather Manufacturers' National Bank v. Morgan, supra. The depositors' failure personally to examine the periodical statements and promptly to acquaint the bank with its own wrongdoing misled the bank in nothing. Therefore the law did not impose upon depositors in this case the duty to check up a pass-book or examine monthly statements to prevent the defendant bank from continuing its own wrongful conduct; nor did the law exonerate the bank from acts which it knew were wrong simply because the depositors had not found it out and had not told it to stop.

We are of opinion that the learned trial judge made no mistake of law in holding the bank liable for honoring checks beyond the authority which the plaintiff depositors had conferred upon it.

[4] The second question in the case relates to the application by the plaintiffs, in ease of Synder's indebtedness to them, of certain money drawn by Snyder from his own account and turned over to the plaintiffs after his dishonesty had been discovered. As it appears that the money which Snyder paid the plaintiffs belonged to him, we find no error in the ruling of the trial judge denying the defendant's claim to credit same against its indebtedness.

The third question—which is both difficult and elusive—has to do not with a question of law but with a question of fact—a question of fact which should have been submitted on an accounting.

In our endeavor to perform the task of accountants, our first difficulty has been in determining whether the facts of the controversy— coming into the case not by evidence but by pleadings and stipulations— are such as admit of an accounting. If the facts are in the case, manifestly they are not in a form that will permit us to place them in debit and credit columns and deduce a result, for they appear entirely by totals—and by grand totals—of hundreds of transactions in figures. After much labor in a field which is not ours, we have, however, evolv-

ed a theory or principle on which, if the facts are present, a judgment can be rendered.

[5] In formulating a theory on which an accounting can be made in a situation where admittedly all items of the account are not present, we come at the threshold to the question of the relation of the parties and of the character of this action arising out of that relation. The parties were a bank and its depositors; their relation was that of debtor and creditors. In this relation the depositors sued, originally in tort, now in assumpsit. Turning to the pleadings, it appears that the plaintiffs seek to recover the difference between all moneys deposited to their credit with the defendant bank and all moneys withdrawn on checks not in excess of the amount authorized and on checks made by Snyder and honored by the bank in excess of the amount authorized by the plaintiffs' power of attorney where the same did not reach them by redeposits with the Girard National Bank. If all moneys deposited to the credit of the plaintiffs with the defendant bank had been moneys belonging to the plaintiffs the matter would be simple enough, but certain of the moneys so deposited, it is claimed, did not belong to them, but belonged to Snyder.

The transactions out of which the difficulty arose were these: After withdrawing from the plaintiffs' account by unlawful checks (a term we shall use for convenience in referring to checks in excess of $1,000) various sums of money aggregating $35,385.06, Snyder, finding himself pinched in time within which to cover his withdrawals, deposited to the credit of the plaintiffs' account in the defendant bank moneys of his own, aggregating the sum of $35,385.06 previously drawn out. After he had deposited, or had added to the plaintiffs' money in the account, or had "restored" (as it has been termed) this latter sum, Snyder went on as before making large deposits in and drawing unlawful checks against his principals' account for the dual purpose of meeting his sales transactions through the Girard National Bank and of taking his employers' money for his own speculative purposes. We assume as a fact in the case that the total deposits made to the credit of the plaintiffs' account in the defendant bank included not only deposits of the plaintiffs' own money but also of Snyder's money to the extent named. This is the crux of the difficulty arising from the record as framed. We find this fact from our reading of the record (paragraph eighteen of the affidavit of defense) where it is said that—

"All of the said $35,385.06 of deposits are included with $36,767.10 of deposits set forth in Paragraph Seven of the amended statement."

[6] Paragraph Seven of the amended statement shows a total deposit to the credit of the plaintiffs' account in the defendant bank of $3,254,015.03, of which the $36,767.10 referred to was a part. If this is right, Snyder's money in the sum of $35,385.06 was credited to the plaintiffs' account and there is pertinency in the bank's contention that the plaintiffs now ask not only for their own money but for Snyder's as well. In other words the defendant bank maintains that the item of $35,385.06 of Snyder's money is included in the total deposits made to the credit of the plaintiffs and therefore constitutes a false item of

gross deposits from which to deduct the total of unlawful checks and to determine the balance truly due the plaintiffs. In this situation of accounting each party, and also the trial judge, framed an argument in figures, which, standing alone, we confess difficulty in answering. Hence it is that we go back to the pleadings and inquire, what are the plaintiffs entitled to recover? Certainly they are entitled to recover every dollar of deposits of their own money, which but for payment by the bank of lawful checks and payment of Snyder's unlawful checks (when no part of them reached the plaintiffs circuitously) would now be in the bank to their credit. It is equally certain that the plaintiffs are not entitled to recover any moneys placed to their credit which was not theirs. We next inquire, whose money was the $35,385.06? That it belonged to Snyder is not disputed. Let us assume for easy illustration that this sum, instead of being drawn out and paid back by many checks, was drawn out by one check and paid back by one check. If the account had shown a balance of $35,385.06 and if Snyder had drawn out the whole of this sum by one unlawful check, Snyder would have taken $35,385.06 of the plaintiffs' money and the plaintiffs' account would have been wiped out. The bank would then have been liable to the plaintiff depositors for just $35,385.06. When later Snyder made a deposit of this amount from money of his own, the plaintiffs' account was restored and they had to their credit precisely the same balance they had before Snyder wrongfully drew it out. The bank owed the plaintiff depositors just the same now as before. If, afterward, Snyder by unlawful checks took a part of the restored $35,-385.06 and deposited it to the credit of the plaintiffs in the Girard National Bank (as he actually did in the sum of $22,942.53) and took the remainder and appropriated it to his own use (as he actually did in the amount of $12,442.53), then the bank on the two new transactions would be liable to the plaintiffs initially for only $35,385.06 and finally for only $12,442.52, because the remainder of the deposits withdrawn by unlawful checks found its way into the Girard National Bank and ultimately reached the plaintiffs.

But in the plaintiffs' statement of claim there arises this situation: The transactions of this complex business were not limited to the deposits and to the withdrawals we have endeavored to describe but extended also to loans of money by the bank to Snyder on options of negotiable paper for $191,938.38, which was refunded and for which no claim was made; an item of $51,741.18 of unlawful checks on which no claim was made; an item of $34,304.20 of unlawful checks on which no claim was made; an item of $5,000 on which no claim was made; an item of a demand loan for $30,023.68 claim for which it is contended was precluded by stipulation; leaving as sums specifically claimed the item of $751.96, balance admittedly due by the bank at the time of the discovery of Snyder's transaction, and an item of $92,750 paid out on thirty-five unlawful checks and kept by Snyder, together aggregating $93,501.96. This is the net sum demanded by the plaintiffs and awarded by the judgment of the court, plus interest. We are not clear whether included in the thirty-five checks aggregating $92,750 were some of the unlawful checks by which Snyder first drew out the

$35,385.06. Apparently some were included. (Paragraph 18, Affidavit of Defense.) The bank contended that' $35,385.06 of Snyder's money should be deducted from the $92,750 (aggregate of the thirty-five checks) on the implication or on the fact that the initial unlawful checks for $35,385.06 are included in the thirty-five checks pleaded. The defendant says it makes no difference whether they were included or not because the thirty-five checks mentioned in suit and calculated by the trial judge in reaching the judgment were only a part of several hundred unlawful checks by which Snyder got the plaintiffs' money; and further because the suit is not on the thirty-five checks but is for the difference between the total deposits and what should have been in bank but for the bank honoring unlawful checks.

[7] There would be force in the plaintiffs' position,—for obviously the suit is on the whole transaction,—were it not for the fact that the plaintiffs in their pleadings eliminated from the whole transaction all items touching unlawful withdrawals of varied kinds except the $92,-750 obtained by Snyder through the named thirty-five unlawful checks. It may be that the controversy does not turn here; yet the plaintiffs expressly admitted by their statement (Record, p. 17, 18) and the trial judge expressly allowed in the judgment (Record, p. 89) the items of $751.96, small balance, and the contested item of $92,750 paid Snyder by the bank through the medium of thirty-five unlawful checks. These were the only two items for which the plaintiffs made claim and on which the court based its judgment. This is true, for the plaintiffs eliminated all other items by showing that they had received the money drawn out by all other unlawful checks and that unlawful advances of the bank otherwise made were covered without loss. Assuming again for convenience that the $35,385.06 was first drawn out by Snyder on one check, what is the situation? If one of the thirty-five checks was used in drawing out this sum when Snyder took it for his own use, and if, after restoring the amount, another of the thirty-five checks was drawn by Snyder on the account thus restored, both checks cannot be counted and charged against the bank as unlawful checks, for they would aggregate $70,770.12, while all the plaintiffs' money that Snyder obtained by the two checks was $35,385.06. If such two checks were charged against the bank it is possible that one or the other of them may appear either in the transactions aggregating $92,750, or in some other transactions. But no shortage is claimed in any other transaction. So on this showing it must be that the $35,-385.06 is in the $92,750. Hence the plaintiffs are entitled not to $92,-750 (plus the small balance) but to $92,750 (and the small balance) less $35,385.06, together with interest properly computed.

[8] But if this reasoning be challenged we await objection to the following: By the seventh paragraph of the plaintiffs' statement they said that, commencing on a certain date Snyder deposited in the bank "to the credit of the plaintiffs' checks, due bills and drafts, the property of the plaintiffs, the moneys representing which were collected by the defendant aggregating $3,182,247.93." That in addition to this sum Snyder deposited in the defendant bank to the credit of the plaintiffs "cash and checks amounting to $36,767.10." Included in this item is

the $35,385.06 in dispute.)   In addition to the above two sums Snyder caused to be placed to the credit of the plaintiffs' account in the defendant bank the sum of $35,000 representing loans made by the defendant bank at the request of Snyder "without the plaintiffs' knowledge and consent" (this item is no part of the $35,385.06 under discussion), and "that the *total* sum credited to the plaintiffs' account by the defendant was $3,254,015.03." A careful analysis of this statement of claim shows that the first large item of deposits was "property of the plaintiffs"; the second and third items do not contain this averment and the plaintiffs do not say whether these were deposits of their money or not. If the $35,385.06 first withdrawn by Snyder by unlawful checks and then restored is included in the total of $3,254,015.03 (as paragraph 7 of the statement clearly says), then all of this large sum was not the plaintiffs' money and the plaintiffs are not entitled to recover a net ascertained from a gross that was not all theirs. *Their* money on deposit was this gross less Snyder's $35,385.06. By deducting Snyder's money from the plaintiffs' estimated gross, we have a new gross deposit of money actually the plaintiffs' from which the unlawful checks should be deducted. From this new gross the plaintiffs should strike a balance of their own moneys, for they are entitled to recover from the bank a sum equal to their total deposits less sums paid out on lawful checks and sums paid out on unlawful checks which ultimately reached them through the channel of the Girard National Bank.

As a last answer the plaintiffs say: But immediately after Snyder's restoration of $35,385.06, $22,942.53 thereof was transferred by unlawful checks from the defendant bank to the Girard National Bank and as it reached us through that channel we have given the defendant credit for that much of the $35,385.06 in the item of $2,847,594.79. But this does not answer the question, because this credit was on only one deposit of $35,385.06, while in the grand total named there are two deposits of this sum.

The remaining dispute relates to three unlawful checks bearing dates June 6, 9 and 16, 1916, for $2,700, $2,600 and $3,000 respectively, disallowed by the trial judge as deductions. We affirm this action if separately considered, for the three checks in question were included in the $35,385.06 of checks unlawfully honored by the bank and therefore are included in the deduction we shall direct.

We affirm the findings of the District Court on all questions, except one, and with reference to that one we direct that the judgment be modified, by deducting $35,385.06 and appropriate interest from the amount thereof.