140 So. 569

**RUDISILL SOIL PIPE CO. v. FIRST NAT. BANK OF ANNISTON.**

**7 Div. 57.**

Supreme Court of Alabama.
March 10, 1932.

Rehearing Denied March 31, 1932.

Miller, Graham & Wingo, of Birmingham, for appellant.

Merrill, Jones, Whiteside & Allen and S. W. Tate, all of Anniston, for appellee.

**FOSTER, J.**

The cause of action is set forth in several counts of the complaint. The court overruled demurrer to each of them. Thereupon defendant filed numerous special pleas, and the court sustained demurrers to some and overruled them to others. They were overruled as to pleas 2 and 3 as a defense to all the counts. Plea 2 was the general issue, and plea 3 was payment. The court made a special finding of facts, trying without a jury, and found that plaintiff should not recover on account of the issue made by the general issue, and further found a payment to plaintiff of each item in plaintiff's claim. So that other rulings on pleadings could not injuriously affect the rights of plaintiff. Because, if the plaintiff has proven the allegations of any one of its counts, and the same relates to an item or items which have not been paid to plaintiff, the judgment and finding are erroneous, and should be reversed. But, if plaintiff has failed to prove all of its counts as it must prove them under the plea of the general issue, or if it has proven one or more of them, and defendant has proven payment of the items thereof, the judgment must be affirmed. The issues being thus narrowed by the findings of the court, we are relieved from inquiring into other aspects of the pleading to determine if error occurred, for, if it did, there would be no prejudice to plaintiff.

The primary subject of discussion which attracts our attention is whether King was duly authorized to cash checks on defendant's bank, when payable to plaintiff, either to obtain the whole amount of such checks, or a part of them, resulting as a legal conclusion from the circumstances, (1) that he had authority to indorse them in plaintiff's name to be collected and deposited to plaintiff's account, and (2) that he had no authority to draw money from plaintiff's account in said bank, except on a check signed by himself as secretary for plaintiff and by plaintiff's president or vice president. We will discuss that question therefore first.

There is ample authority to the effect that, when the power conferred upon an agent to indorse checks is limited in form to be for

the purpose of a deposit to the account of the principal, an indorsement pro forma by such agent, upon which a bank collects the check and places the amount of it to the personal credit of the agent, or pays him the cash, amounts to a forged indorsement, and does not transfer title in the check to such bank, and it is liable for its conversion and, when it collects the money, for money had and received, or as a banker to depositor. First Nat. Bank v. Montgomery Cotton Mfg. Co., 211 Ala. 551, 101 So. 186; Rosenberg v. Germania Bank, 44 Misc. Rep. 233, 88 N. Y. S. 952; Citizens' Bank v. Importers' & Traders' Bank, 49 Hun, 607, 1 N. Y. S. 664; Brady on Bank Checks p. 270; Strong v. Missouri-Lincoln Trust Co. (Mo. App.) 263 S. W. 1038; Standard Steam Specialty Co. v. Corn Exchange Bank, 220 N. Y. 478, 116 N. E. 386, L. R. A. 1918B, 575; Graham v. Southington Bank & Trust Co. (1923) 99 Conn. 494, 121 A. 812; Deri v. Union Bank of Brooklyn, 65 Misc. Rep. 531, 120 N. Y. S. 813; Exchange Bank v. Thrower, 118 Ga. 433, 45 S. E. 316.

If there is no restriction as to the form of indorsement prescribed for the agent, or his indorsement is authorized to be pro forma, such indorsement by him is not a forgery, but passes title in the check, and the drawee bank which pays money for the check, not chargeable with notice that he is authorized to use it for deposit only, and not bound to ascertain the extent of his authority, is protected, and the principal cannot recover the proceeds from one thus acting in good faith; likewise any one else would be protected who purchases such check from the agent for value and without notice of a want of authority to sell it but with authority to indorse it in that form. Brady on Bank Checks, pp. 271, 272; Kansas City, M. & B. R. R. Co. v. Ivy Leaf Coal Co., 97 Ala. 705, 12 So. 395; 12 A. L. R. note, page 117.

■ The authorities we have cited hold (and correctly so, we think) that, when an agent, having his principal's checks for deposit to the account of his principal in a bank where he has a deposit account, delivers them to that bank for collection, they constitute funds of the principal due to be accounted for by that bank as though such agent had delivered funds of its principal in other form for that purpose. Under such circumstances, if the agent indorses the checks in form pursuant to authority, the title having passed to the bank, there is no conversion of the checks, but the bank is in the relation of banker to depositor as to the entire amount, though it has paid the agent the cash on them; but, if the agent had no authority to indorse in that form, the title did not pass, and some authorities hold that the remedy is conversion. Deri v. Union Bank of Brooklyn, supra. Others hold that, if the indorsement was not authorized in form, and though the title did not pass, yet, when the bank collected the money on the checks, it was due to account to the principal as any other funds in its deposit account. Strong v. Missouri-Lincoln Trust Co., supra; Standard Steam Specialty Co. v. Corn Exchange Bank, supra.

■ So that, when an agent delivers his principal's checks to the principal's bank in which he has a deposit account, and they are known to the bank to be for collection as the property of the principal, the funds collected on account of such checks can ordinarily only be paid out by the banker in such manner as would be otherwise sufficient to draw upon the bank account. When the depositor notified the banker to honor no checks except those signed by the president or vice president and secretary, and furnished a signature card effective for "the payment of funds or the transaction of any other business," that was sufficient notice to it not to pay cash collected or to be collected for it except in that manner. Graham v. Southington Bank & Trust Co., supra. The depositor doubtless could by acquiescing in a course of dealing, known to it, create authority in his agent otherwise to draw its funds than by the method set forth in its written instructions.

■ Bank employees testified that frequently King cashed checks payable to plaintiff and indorsed with the rubber stamp by him. But they do not claim that they so informed plaintiff or that it had occasion to know of it. The testimony of King in respect to such notice to Mr. Rudisill is indefinite and unsatisfactory, if that is what it means. But that situation is not the same as when King places the checks in defendant's bank for collection as the property of plaintiff. King might, by such indorsement, sell such check for cash to an innocent purchaser, who would be protected, because he had authority thus to indorse, but he could not put it in the bank in which plaintiff had an account for collection as plaintiff's property, and at the same time draw out its proceeds except as plaintiff directed. Plaintiff had no notice of payments made by defendant to King when such deposits were made, until after they all occurred.

Again the bank claims that it was the duty of plaintiff to examine the accounts and vouchers returned by the bank and its passbook, and duplicate deposit slips, which would have shown the first breach of duty by King, whereupon plaintiff should have so advised the bank and again cautioned it in respect to such practice. We observe that in fact after the first irregular withdrawal, on June 11, 1927, and on August 6, the plaintiff gave the bank written instructions as to withdrawals, but made no complaint as to that irregularity.

On the general subject of the duty of the depositor, we refer to the following cases and their comments. In First National Bank v. Allen, 100 Ala. 476, 14 So. 335, 27 L. R. A.

426, 46 Am. St. Rep. 80, it is said that, while the bank is bound to know the signature of its depositors, there is a corresponding duty upon the depositor to examine his accounts and vouchers and himself to detect forged checks and to make them known to the banker. And, when monthly statements are made and vouchers returned, the bank is only liable for payments before furnishing the first monthly statement. This was reaffirmed in McCarty v. First National Bank, 204 Ala. 424, 85 So. 754, 756, 15 A. L. R. 153, with the further statement that: "The rationale of the rule is that, having been furnished with the means of knowledge, it is the depositor's duty to know; and, knowing, he is under the further duty of informing the bank of whatever he finds to be wrong." 7 Corpus Juris, 687; Boaz Bank v. Nailer, 213 Ala. 314, 104 So. 793.

In the case of Leather Mfrs. Nat. Bank v. Morgan, 117 U. S. 96, 6 S. Ct. 657, 663, 29 L. Ed. 811, the subject is thoroughly considered in a case similar to our Allen Case, supra, and the statement of the rule is expressed in a manner also similar to the Allen Case. But in that case, forged checks of depositor being involved, the court said: "Of course if the defendant's officers, before paying the altered checks, could by proper care and skill have detected the forgeries, then it cannot receive a credit for the amount of those checks, even if the depositor omitted all examination of his account."

This expression of that court has been used as the predicate in many cases to establish the principle that the doctrine of estoppel against the depositor resulting from a failure to make such examination does not exist when the bank was negligent in the matter. Union Tool Co. v. F. & M. Nat. Bank, 192 Cal. 40, 218 P. 424, 28 A. L. R. 1417; Glassell Development Co. v. Citizens' Nat. Bank, 191 Cal. 375, 216 P. 1012, 28 A. L. R. 1427; First Nat. Bank v. Farrell (C. C. A.) 272 F. 371, 16 A. L. R. 651; National Dredging Co. v. Farmers' Bank, 6 Pennewill (Del.) 580, 69 A. 607, 16 L. R. A. (N. S.) 593, 130 Am. St. Rep. 158, quoting extensively from our Allen Case, supra; Morgan v. U. S. Mortgage & Trust Co., 208 N. Y. 218, 101 N. E. 871, L. R. A, 1915D, 741, note 753 Ann. Cas. 1914D, 462; New York Produce Exch. Bank v. Houston (C. C. A.) 169 F. 785; Coleman v. First Nat. Bank (Tex. Civ. App.) 252 S. W. 215; Critten v. Chem. Nat. Bank, 171 N. Y. 219, 63 N. E. 969, 973, 57 L. R. A. 529; 3 R. C. L. 537, 538, §§ 167, 168; Merchants' Nat. Bank v. Nichols & Shepard Co., 223 Ill. 41, 79 N. E. 38, 39, 7 L. R. A. (N. S.) 752; Graham v. Southington Bank & Trust Co., supra.

This case does not present a question of forgery, for the indorsements were authorized. The deposits corresponded with the cash book of the company, and an examination of the accounts and vouchers rendered monthly disclosed nothing of what is claimed to have been irregular, and no other records in plaintiff's office made such disclosure. The circumstances appeared on the deposit slips, showing that, when the deposits were made, amounts of cash were withdrawn, but did not so appear on the passbook or other books of plaintiff. Those deposit slips or duplicates of them, except the first one, were found in the office of plaintiff, the depositor, and subject to its inspection.

■ But a bank cannot disobey the instructions of its depositors to pay its funds only in a certain manner, and, when one of the depositor's agents not authorized to draw money, except as directed, represents to the bank that he needs it for certain purposes of plaintiff, the bank is not authorized to rely upon his statements in that respect, and may not, without authority of plaintiff, comply with such requests of the agent, except at its own risk. In this case the deposit slips were for information to the bank. The balance was entered in plaintiff's passbook. The entries in the passbook show no unauthorized act of King. The duplicate deposit slips do. The inquiry is whether plaintiff should have examined them as well as the passbook. He did examine the passbook and vouchers, and the deposit slip could hardly be expected to show an irregularity not shown on the passbook. In view of a positive violation of instructions to defendant by plaintiff, did plaintiff owe defendant the duty to make examination of incidental memoranda (or even other matter) in order to discover if defendant was observing such instructions? The bank had knowledge of its own violation of plaintiff's instructions. It is said that there is no duty on the depositor to check up books and accounts to prevent the bank from continuing its conduct in violation of instructions. First Nat. Bank v. Farrell, supra.

Plaintiff's auditor and King agree in substance that the shortage occurred by taking cash items not connected with the petty cash. Those cash items would be entered on the cash book. But at the time he would have checks payable to plaintiff. He would not then post those checks, but, when he made his bank deposit, would use them in place of the cash he had abstracted, but they would not always be equal to the cash abstracted. He then took enough from petty cash to adjust the difference, and the deposit would balance his cash book, leaving petty cash short. Soon other checks would come in, which he would likewise keep off the books for a while, and would then post up the former, but deposit the latter, and deduct from the deposit money which he collected from the bank, and returned it to the petty cash fund, before that fund was again checked up. So that it so happened that, though every time the petty cash fund was checked it showed a

clean status, there had been a time when, if checked, it would not have been clear.

Such process is explained only in general terms. No evidence is shown that at any certain time when King secured such funds from the bank they replaced that exact amount of petty cash so abstracted. In fact, the records could not show this, and were fixed to that end. King remembers and explains some of the transactions. The auditor testifies that on each such occasion King was in fact short with plaintiff in an amount more than the sum then so withdrawn from the bank. King testified that in each instance those amounts were placed by him in the petty cash fund and used for the plaintiff, though he may have on some later occasion again used funds presumably in the same manner from petty cash. His use of those funds was only temporary, and they were soon replaced, because they were checked monthly at irregular periods. When money was thus placed in petty cash, it was due to make its assets equal $1,700. If they had not been depleted by that amount, such addition would increase it beyond the limit. So that, when they were made, it had been depleted on some account. But its only legitimate depletion in ordinary course was by amounts shown by tickets, and petty loans entered on its loan book. If not thus depleted, or for some special reason, for plaintiff's benefit, it had no occasion to go into that drawer, and apparently did so only to bring it to its standard.

The first transaction occurred June 11, 1927. King had a check to order of "petty cash tickets," for $455.99, which he had authority to collect and place in petty cash. Instead of that, he deposited it with other funds, and withdrew only $331.89, which he placed in petty cash. This difference is not explained. It apparently needed $455.99 for legitimate tickets, but only received $331.89 from this source. This shows no abstraction from petty cash, nor that it concealed abstractions elsewhere, but that it went where King was due to place it for an authorized purpose. We are left to conjecture how this fund reached the full quota of $1,700 by this addition. It apparently was reached, but it could not have been because he had abstracted money from it. That would have called for more than $455.99, rather than less than that sum. The auditor says he evidently took up a little cash out of the general fund and put that in the petty cash. In thus withdrawing from the bank $331.89, instead of $455.99, and putting it where it was due to be, pursuant to his duty, there was a proper disposition of it, though the form of the transaction was unauthorized.

■ On December 29, 1927, King testified that he deposited in bank to plaintiff's credit $900 out of petty cash for safe-keeping during the holidays. On January 13, 1928, after the holidays, he deducted from a deposit of two checks the sum of $900, and on the deposit slip described it as for "Petty Cash." This he says he replaced in that fund. Though he may have been short to that extent, and more or less, if this testimony is true the transaction was not intended to, and did not, conceal such shortage, and was not directly connected with it. He says that Mr. Rudisill knew of and approved the deposit of that sum for safe-keeping, though he did not know it was withdrawn from the bank in that irregular manner. The court found the facts as King testified. The evidence supported the finding, and the result is that the transaction did not prejudice plaintiff, and it should not recover on that account.

■ King also testified, and the court found, that on June 30, 1928, he took $200 out of petty cash, and deposited it in plaintiff's bank account, the deposit slip showing the item as "Petty Cash Currency," and on July 2, 1928, he likewise took $275, and made a similar deposit. His explanation is that they were needed to take care of an overdraft at the bank; that petty cash had the money and the general funds did not. Then on July 7, 1928, there came in a big check of $5,871.80, which he deposited, though from the deposit he deducted $475, which the bank paid him, and which he entered on the deposit slip as "Petty Cash," and replaced that amount in such fund. Although at that time the general fund did not have the cash he abstracted from it, that fact only furnished the occasion for the need of $475 from the petty cash. But that sum was taken from petty cash with the knowledge of Mr. Rudisill, as King says, and did not have the effect of nor was it intended to conceal such abstractions. The only connection with the shortage was that it would not have been necessary, presumably, but for the shortage. The restoration of that amount to petty cash, therefore, did not fill a gap made by the improper use of petty cash funds. Its connection with the shortage was too remote to hold that it did not constitute a repayment to plaintiff's petty cash of funds used from that source for a purpose approved by Mr. Rudisill. Therefore we think plaintiff is not due to recover the amount of that item.

Likewise we think it is true that the amount of $73.14, the aggregate of the personal checks of Mr. Rudisill, was refunded to petty cash on account of sums to that extent used out of it to furnish cash for deposit representing his personal tickets for sums not due that fund. The use of those sums from petty cash was not for King's benefit, nor to conceal his defaults, but were for plaintiff's benefit. Therefore the restoration of them to petty cash had no proximate con-

nection with nor result of his defaults, and therefore plaintiff is not due to recover them.

■ The only thing shown by the evidence as to the check of K. A. S. and L., March 12, 1928, is that it was payable to plaintiff, drawn on defendant, and indorsed and cashed by King at defendant's bank, and the cash placed in the petty cash drawer. The check was not taken by defendant for collection as plaintiff's property, and it was not taken in connection with a deposit transaction. King had authority to so indorse the check. We think that the drawee bank could upon such indorsement thus pay the cash to King without risk of loss, and that plaintiff should not recover of defendant on that account.

■ The items of January 23, 1928, $147.72, March 14, 1928, $60, have not been explained. King does not show, neither is there other evidence, that they replaced sums drawn from petty cash on any legitimate account. On the other hand, the testimony of King explaining his method of conducting the transactions, conformably with that of the auditor, is that they replaced funds abstracted to conceal his use of cash from the general fund. It was undoubtedly to replace funds taken from petty cash. In ordinary course they would be represented by tickets and a check drawn for the difference. Neither that nor any other legitimate withdrawal is shown. But King says that, though he has no recollection of those occasions, he does know that such was his method of concealing his defaults. The court makes no finding specially as to those items, or the occasion of the necessity to replace those amounts in the petty cash fund, but in general terms includes them with others in the twelfth paragraph of its findings as follows:

"12. That none of the funds received by said King as deductions from the deposits as above set out, or as the proceeds of the checks cashed by him as above set out, was thereupon converted to his own use, but in each instance said funds were by said J. W. King secured from the defendant to restore the said petty cash account to its normal size of $1700.00, and said funds were placed by said J. W. King in said petty cash drawer, and with said petty cash fund in said cash drawer, to restore the same to its normal amount of $1700.00; that said funds so placed in the petty cash drawer, as well as the funds already in said cash drawer at said time together totalling with any cash tickets therein the sum of $1700.00, were to be used for the benefit of plaintiff in making advances and purchases as hereinabove set out. That if any part of any amount of any of said sums secured from defendant were at any time later converted by J. W. King to his own use, or misappropriated by him, the amount thereof was not shown by the evidence."

While we may concur in such finding, that alone does not preclude a recovery by plaintiff, because it would thereby lose sight of the principle of law that it would not be in essence a payment to plaintiff merely to provide its own funds to King by the bank in an unauthorized manner to cover up and conceal his defaults.

Because we think the principle is sound and sustained by authority that, if King used such funds directly to replace amounts converted by him or to conceal such conversions, those funds to that extent did not constitute an effectual payment to plaintiff. Stumpp v. Farmers' Loan & Trust Co., 109 Misc. Rep. 24, 178 N. Y. S. 811; Merchants' Nat. Bank v. Nichols & Shepard Co., 223 Ill. 41, 79 N. E. 38, 7 L. R. A. (N. S.) 752.

The court evidently failed to make application of that theory to those items.

Our judgment is, therefore, that appellant is due to recover of defendant the aggregate of the two items, to wit, January 23, 1928, $147.72, and March 14, 1928, $60, with interest from July 19, 1929, the date on which plaintiff first made demand for their return (tr. p. 131), and for such sum a judgment is here rendered for appellant against appellee and all costs of this cause.

Reversed and rendered.

ANDERSON, C. J., and GARDNER and BOULDIN, JJ., concur.