41 So.2d 406

### SEABOARD SURETY CO. v. FIRST NAT. BANK OF BIRMINGHAM.

### 6 Div. 775.

Court of Appeals of Alabama.

April 19, 1949.

Rehearing Denied May 17, 1949.

438

Cabaniss & Johnston, of Birmingham, for appellee.

HARWOOD, Judge.

The appellant, Seaboard Surety Company, was the fidelity insurer of the employees of the Watts-Newsome Co., the Southern Lighting Co., and John Parks Newsome, Inc., all of Birmingham. The companies were owned by the same stockholders, operated out of one office, and were staffed by the same personnel. For convenience they will hereinafter be frequently referred to as the companies.

On or about 1 March 1946 Marjorie Coleman was employed by the companies as bookkeeper.

In the latter part of April Marjorie Coleman cashed three checks signed by the Watts-Newsome Co., and one check signed by John Parks Newsome, Inc., and which had been delivered to the Southern Lighting Co. for a valuable consideration, the proceeds of which did not reach the said Southern Lighting Company. The appellant paid to the company the amount of these checks, which are the subject of this litigation.

The Seaboard Surety Company, as subrogee of the company or companies, originally filed suit in the Intermediate Civil Court of Birmingham, on a complaint con-

taining four counts. That court rendered judgment in favor of the defendant, the First National Bank of Birmingham. The Seaboard Surety Company perfected its appeal from this judgment to the Circuit Court for the Tenth Judicial Circuit.

Although several amendments to the complaint were filed in the Circuit Court, it appears from the minute entry of the Circuit Court that thereafter the plaintiff, the Seaboard Surety Company adopted as its complaint the complaint filed by it in the Intermediate Civil Court which had been certified to the Circuit Court.

The case was tried de novo before Honorable J. Russell McElroy, a judge of the Tenth Judicial Circuit, without a jury.

A stipulation was entered into by and between the respective parties that the plaintiff sought recovery on two theories, first, conversion, and second, money had and received; and that the court should consider the case on both theories as if good counts covering both had been filed.

After hearing the evidence the Circuit Court entered a judgment in favor of the defendant, the First National Bank. From that judgment the Seaboard Surety Company duly perfected its appeal to this court.

In the trial below Alma Louise Eaves, a witness for the plaintiff, testified that in her capacity as office manager for the companies, she, on or about 1 March 1946, employed Marjorie Coleman as bookkeeper for said companies.

During the term of Marjorie Coleman's employment, and for some years prior thereto, checks received by the above three named companies, and which were to be deposited to the credit of any of said companies were endorsed by a rubber stamp which read: "Pay to the order of the First National Bank of Birmingham, Ala.," followed by the rubber stamped name of the company to whose credit the check was to be deposited. Checks so endorsed had always been credited to the individual account of the company shown by such endorsement.

The four checks which are the basis of this suit were received in evidence as plaintiff's Exhibits Nos. 2, 3, 4 and 5. The total sum of these checks is $351.73. Each of these checks is payable to a different payee, and has been endorsed by the original payee.

There also appears on each of said checks the rubber stamp endorsement "Pay to the order of the First National Bank of Birmingham, Ala., Southern Lighting Co., Inc." However, across each such rubber stamp endorsement has been scratched bold pen or pencil marks.

Beneath this appears the written name "Marjorie Coleman."

Two other checks, not covered by the pleading in this case were also received in evidence as plaintiff's Exhibits Nos. 1 and 6.

Exhibit No. 1 is a check in the amount of $875.78, bearing date of April 23, 1946, signed Watts-Newsome Co., L. F. Stein and A. L. Eaves, and payable to A. L. Eaves, Cashier. This check bears the true endorsement of A. L. Eaves, Cashier, and the rubber stamp restrictive endorsement of the Watts-Newsome Co. This rubber stamp endorsement has however been scratched through. No other endorsement appears thereon. This check was cashed by the defendant bank on April 29, 1946, upon presentation by Marjorie Coleman.

Exhibit No. 6 is a check payable to Watts-Newsome Co. in the amount of $214.90, bears date of April 17, 1946, and is drawn on the First National Bank of Tuscaloosa, Alabama, by Sokol Bros. Co., Inc. This check bears the endorsement of Watts-Newsome Co., A. L. Eaves, and was cashed on April 25, 1946 by the defendant bank on presentation by Marjorie Coleman. Mrs. Eaves however testified that she had not made the endorsement shown thereon, nor had she authorized Marjorie Coleman to do so.

Mrs. Eaves testified further that Marjorie Coleman did not have the right or authority to strike out these rubber stamp endorsements, or to add her own endorsements to any of said checks where such appears to have been done.

On cross examination Mrs. Eaves testified that it was part of Marjorie Coleman's duties as bookkeeper to go to the bank

daily for the purpose of depositing checks to the credit of the companies, and also to obtain cash on some checks with which to replenish the companies' petty cash fund.

In this connection it was Marjorie Coleman's duty to determine what checks belonging to the companies were to be deposited to their respective credits, and which checks were to be cashed. In this connection the record shows the following:

"Q. (By Mr. Brown:) I want to get just one thing else straight. It was Marjorie Coleman's duty to place this on the back of checks? A. Yes, sir.

"Q. The rubber stamp endorsement? A. That is right.

"Q. And it was her duty to determine whether or not a check was to be deposited in the bank or used for cash, is that right? A. After she had been there some time, it was.

"Mr. Brown: That was all I wanted to know."

Mr. R. A. Brown, head of the teller's department of the Birmingham Trust and Savings Company, and a man of 30 years experience in banking, testified for the plaintiff that for many years it had been the common practice among the banks in the city of Birmingham for depositors to endorse checks for deposit by the use of a stamp "Pay to the Order of the Bank, and then containing the depositor's name." He testified that during April of 1946 and for a number of years prior thereto it was known to tellers in banking circles that the checks endorsed "Pay to the order of The First National Bank of Birmingham, signed by the depositor, or a check made payable to Birmingham Trust & Savings Bank of Birmingham and signed by the depositor with a rubber stamp" was for deposit only.

Mr. Brown was shown the five checks marked as plaintiff's Exhibits 1, 2, 3, 4, and 5, and he was questioned with reference to the custom in banking circles when checks, where the restricted endorsement for deposit had been partially obliterated, were presented to a teller by a young lady who had been with the depositing company from thirty to sixty days, and who had been in the habit of taking checks to the bank for deposit, and was asked if the young lady presenting the checks would be given the cash on same without inquiry. Mr. Brown testified it would not be the practice to pay a check under these circumstances and that it would call for an investigation, and that the custom would be to refer the check to someone in authority for investigation.

On cross examination Mr. Brown testified that tellers of banks have some discretion as to items presented to them; and that the amount of discretion depends to some extent on how well the person who presents the item is known to the teller; that banks encourage people to come to the same window so that tellers will get to know the people, the nature of the business in which the person is engaged, and the cash and deposit requirements of the person; that corporations daily do business through agents at the Birmingham Trust National Bank; and that, after an agent has been doing business daily at the Birmingham Trust National Bank, that bank would only question the agent's authority to a certain extent.

In reference to his ability to give testimony as to the custom and practice of banks generally, Mr. Brown testified that he had never had any conferences with any officer of any bank in Jefferson County in reference to the practices of the other banks in Jefferson County in cashing checks on which an endorsement had been stricken out; that banking is a competitive field in Birmingham; that different banks have different practices on different items; and that he had not been an active member of a school conducted by the American Institute of Bankers for seven or eight years.

Mr. Brown further testified on cross examination that people make errors in depositing checks and that it could be possible that people have to strike out their endorsements on a check every once in a while because of some error or because the signature is in the wrong place, or something like that.

On rebuttal Mr. Brown further testified that when the party presenting the check is a mere employee, such as a girl making de-

posits, and she attempts to get cash on a check where the restricted endorsement has been stricken, inquiry is made of the people higher up and in authority with the depositor.

For the defense Miss Rosalie Lewis, who had been employed by the defendant bank for about six years, and had been a teller in said institution for over four years, was called as a witness.

She testified that she first became acquainted with Marjorie Coleman when she began working for the companies in March of 1946, and that Marjorie Coleman had come to her window every day in March and April of 1946, when she presented some checks for deposit and some checks to be cashed.

Upon examining the checks, which are the plaintiff's Exhibits 2, 3, 4 and 5, Miss Lewis stated she had paid Marjorie Coleman the total face amount of the four checks. She testified that the rubber stamp endorsement was stricken out when these four checks were presented to her by Marjorie Coleman, who upon being questioned said she had stamped the endorsement on the checks in error and wanted them cashed to replace her petty cash fund, after which explanation Marjorie Coleman was given the cash on said checks.

With reference to plaintiff's Exhibit 1, being the check in the amount of $875.78, Miss Lewis, testified that this check was presented by Marjorie Coleman on April 29, 1946, at which time the endorsement had been scratched out, and that said Marjorie Coleman again gave the explanation that she had stamped the check in error and wanted cash for it, and the face amount of the check was paid to Marjorie Coleman.

She further testified that the six weeks previous to April 24, 1946, Marjorie Coleman had deposited some checks every day, and also had cashed some checks every day for her petty cash fund.

On cross examination Miss Lewis stated that prior to her cashing the checks on April 24, 1946, and April 29, 1946, just referred to, Marjorie Coleman had never brought to her window checks with the endorsement of the Southern Lighting Company or Watts-Newsome Company blotted out or attempted to be scratched out, and she had never cashed any checks of such a nature before. She further stated that she could see there had been an endorsement on the $875.78 check and that she gave the money to Marjorie Coleman who had not endorsed the check.

According to Miss Lewis, Marjorie Coleman had gone from March 1 to April 24, 1946, without presenting any checks to be cashed where the endorsement for deposit had been scratched out. Miss Lewis testified that during the three and one-half years she had been employed by the defendant bank as a teller before April, 1946, no person had ever brought a check to her with the endorsement of the depositor made by rubber stamp scratched out, and that this was the only instance in her period with the bank where she had been confronted with a situation of this kind.

The witness further testified that she remembered particularly the cashing of the check in the amount of $875.78 because of the fact that the endorsement was scratched out and was unusual and extraordinary.

Miss Lewis further testified that when the checks were presented by Marjorie Coleman she did not call Watts-Newsome Company with reference to the cashing of the checks containing the mutilated endorsements. She testified she knew nothing about the authority of Marjorie Coleman, other than she was a bookkeeper, and that she never at any time made any inquiry of any of the officers of the Southern Lighting Company or Watts-Newsome Company as to what authority, if any, Marjorie Coleman had with reference to endorsing checks.

It is to be noted that this record is lacking in any evidence pertaining to any agreement between the companies and the bank as to the forms of endorsements to be used by the companies to effectuate the manner in which the companies' checks were to be handled to accomplish a particular banking result. Likewise no signature cards are in evidence.

This case has been elaborately briefed by able counsel for each litigant. It appears

to us however that the point decisive of the case is whether there is evidence tending to reasonably establish that Marjorie Coleman had the legal power to strike the restrictive endorsements on the checks cashed by her. If so, then the judgment of the lower court who heard the testimony ore tenus, cannot be said to be clearly erroneous, and in such event should of course not be disturbed by us.

To recapitulate, the evidence pertaining to the authority and duties of Marjorie Coleman tends to show that soon after her employment as bookkeeper she began making daily visits on business days to the First National Bank of Birmingham for the purpose of depositing checks belonging to the respective companies by which she was employed, or to cash certain checks belonging to these companies. It was further a part of her duties to determine, apparently without supervision, which checks were to be deposited, and which were to be cashed.

On those checks which she determined were to be deposited she placed the rubber stamp endorsement. She also without supervision made up the deposit slips of the items to be deposited by the companies.

On 24 April 1946 Marjorie Coleman presented to Miss Lewis, the teller in the bank with whom she had had daily transactions in depositing and cashing her employers' checks, the four checks which are the basis of this suit, and at the same time presented other checks for deposit. The four checks which are the basis of this suit bore the true endorsement of the payee, the rubber stamp deposit endorsement of the Southern Lighting Company through which lines had been scratched, and the signature of Marjorie Coleman. Marjorie Coleman informed Miss Lewis that the rubber stamp endorsement had been placed on the four checks in question through error, and that she wanted these four checks cashed in order to replenish the petty cash fund. These checks were then cashed by Miss Lewis and the proceeds were handed to Marjorie Coleman.

Section 50, Title 39, Code of Alabama 1940, provides that the owner may at any time strike out any endorsement which is not necessary to his title.

The rubber stamp endorsements placed on the four checks in question were not necessary to the companies title. Without question any agent of the companies clothed with authority could have deposited, or cashed, the checks, and appropriately endorsed them for the purpose desired. Marjorie Coleman had been given, and since shortly after her employment, had exercised, the authority to determine what checks were to be deposited, and which checks were to be cashed by her for her employers. On those checks which she, without supervision, determined were to be deposited she placed the rubber stamp endorsement. Those checks which she determined were to be cashed were not so endorsed.

Having the authority to first determine if a particular check was to be endorsed for deposit, or cashed, and the further authority to place the restricted endorsement on a check if she herself so determined, it is our opinion that the trial judge was fully justified in determining as a legal conclusion that Marjorie Coleman also had the implied authority to strike such endorsement. Cf. Glens Falls Indemnity Co. v. Palmetto Bank, 4 Cir., 104 F.2d 671.

This being so the four checks were not taken in connection with a deposit transaction, nor for collection. The drawee bank could therefore pay the checks without incurring liability. Rudisill Soil Pipe Co. v. First National Bank of Anniston, 224 Ala. 436, 140 So. 569. See also, Brady on Bank Checks, pp. 270, 271.

It is therefore our conclusion that the evidence is ample in its tendencies to support the judgment of the lower court and that an affirmance of this cause must follow. It is so ordered.

Several other points are argued in appellant's brief. Concluding that the above principles are decisive of this cause we have foregone discussion of them, and reserve consideration of them.

Affirmed.

BRICKEN, P. J., not sitting.